1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLARENDON NATIONAL INSURANCE COMPANY, a New Jersey Corporation, | 1:99-cv-5461-SMS |
| Plaintiff, | MEMORANDUM OF LAW, FINDINGS OF FACT, AND CONCLUSIONS OF LAW FOLLOWING COURT TRIAL |
| v. | |
| INSURANCE COMPANY OF THE WEST, a Texas Corporation, et al., | |
| Defendants. | |
| INSURANCE COMPANY OF THE WEST, | |
| Counter-Claimant, | |
| v. | |
| CLARENDON NATIONAL INSURANCE COMPANY, | |
| Counter-Defendant. | |

This matter was tried to the Court on September 20 and 21, 2004. Ira S. Lipsius and Andrew Karonis of Shindel, Farman & Lipsius, LLP, appeared and argued on behalf of Plaintiff Clarendon National Insurance Company (Clarendon); and James P. Wagoner and Dana E. Denno of McCormick, Barstow, Sheppard, Wayte & Carruth, LLP, appeared and argued on behalf of Defendant

1

Insurance Company of the West (ICW). The joint pretrial statement filed on May 14, 2004, was adopted in place of the earlier pretrial order as the order governing the trial. (R.T. at 6.) Transcripts of the trial were filed in this Court on November 2, 2004; by February 8, 2005, the parties had submitted Defendant's post-trial brief, both parties' proposed findings of fact and conclusions of law and replies thereto, and Defendant's reply to Plaintiff's Appendix. On August 23, 2005, each party filed supplemental briefing as directed by the Court. The Court has considered these matters as well as all the briefing submitted before the trial, and the matter has been submitted to the Court. The matter has been referred to the Magistrate Judge for all proceedings, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73(b), and Local Rule 73-301.

## ISSUES TRIED

The parties have stipulated that all legal issues resolved by the Court's order of June 30, 2000, with the sole exception of the Court's determination regarding the materiality of G&P's alleged misrepresentation which is set forth at II.C. of the June 30, 2000 order, are deemed the law of the case. (Joint Pretrial Statement and Pretrial Order filed May 14, 2004 at 28.)

In the order of June 30, 2000, Judge Coyle determined that the ICW policy's coverage of G&P under the base policy is primary over the Clarendon policy; the Clarendon policy's MCS-90 endorsement provides no coverage for purposes of disputes among insurers over ultimate liability and thus provides no coverage as against ICW; and Clarendon is entitled to indemnity/reimbursement of legal fees Clarendon paid in defending H&G because Clarendon's

2

liability arises only from the MCS-90, a governmentally required filing.

In the order of January 16, 2001, Judge Coyle granted Defendant's motion for a new trial or to alter and amend judgment, determining that there was a dispute of material fact regarding whether G&P engaged in material misrepresentation and/or concealment in applying for the ICW policy which had not been waived or lost by estoppel because neither waiver nor estoppel had been established on the evidence submitted by Clarendon, the subrogee of G&P, ICW's insured.

At the trial, the Court determined that Judge Coyle had thus already decided that the ICW base policy covering G&P was primary and that the truck, which included the trailer, was a specifically described auto. (R.T. at 10-11.) The Court further concluded that in addition to the misrepresentation defense to ICW's coverage, the trial would also cover the issues of waiver and/or estoppel against denying coverage on the ground of misrepresentation. (Id. at 11-12.)

The parties reserved the right to stipulate to the amounts expended by the parties in defending underlying legal actions that were filed as a result of the accident in which the insured was involved. (Id. at 18-19.)

Therefore, the issues tried at the bench trial in September 2004 are whether or not material misrepresentation or concealment rendered the ICW insurance contract void or otherwise provided a defense to ICW, and whether or not this defense was waived, or ICW is estopped to raise it.

///

MEMORANDUM OF LAW

I. Governing Law

In his order of June 30, 2000, Judge Coyle determined that the law governing the interpretation of the policies and the insurer's obligations was the substantive law of California. Id. at 10-12. Neither party seeks to reopen that issue or argues that any other law should govern the issues remaining in dispute. Thus, California law governs.

II. Burden of Proof, Persuasion; Defense

Defendant has the burden of proof by a preponderance of the evidence of each fact the existence or nonexistence of which is essential to the affirmative defense of misrepresentation. Cal. Evid. Code §§ 115, 500; Thompson v. Occidental Life Ins. Co. of California, 9 Cal. 3d 904, 915-916, 919 (1973); see, Liodas v. Sahadi, 19 Cal.3d 278, 286-90 (1977). The elements in the present case[1] are intentionally false material misrepresentation or concealment of facts with the intent to defraud and in order to obtain insurance coverage; a mere mistake or negligence is not sufficient. Leasure v. MSI Insurance Co., 65 Cal.App.4th 244, 247-48 (1998); Hyland v. Millers Nat. Ins. Co. 91 F.2d 735, 743 (9th Cir. 1937), rehg. denied, 92 F.2d 462, cert. denied, 303 U.S. 645. "Preponderance of the evidence" means that the trier of fact is only required to believe that the existence of a fact is more probable or reasonable than its nonexistence, Kennedy v. Southern California Edison Co., 268 F.3d 763, 770 (9th Cir. 2001)

---

[1] As is later discussed, the parties' contract provided that it would be void if there were fraud or intentional concealment or misrepresentation; thus, a higher standard (i.e., requiring intentional misrepresentation or concealment as to a material matter) than that otherwise provided for by statute is operative in the instant case.

4

(applying California law), and that in terms of the probability of truth of evidence, when weighed with that opposed to it, the evidence has more convincing force and greater probability of truth, <u>Leslie G. v. Perry & Associates</u>, 43 Cal.App.4th 472, 482-83 (1996).

    III. <u>Intentional or Negligent Concealment or Misrepresentation</u>

    A. <u>California Statutory Law</u>

Under California statutory law, neglect to communicate that which a party knows, and ought to communicate, is concealment. Cal. Ins. Code § 330. Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract as to which he makes no warranty, and which the other has not the means of ascertaining. Cal. Ins. Code § 332.

California statutory law provides that concealment, whether intentional or unintentional, entitles the injured party to rescind the contract. Cal. Ins. Code § 331. Thus, under the statute, negligent or even innocent concealment warrants rescission. <u>Barrera v. State Farm Mut. Auto Ins. Co.</u>, 71 Cal.2d 659, 666 n. 4 (1969); <u>Mirich v. Underwriters at Lloyd's London</u>, 64 Cal.App.2d 522, 529-30 (1944).

The completion of the contract of insurance is the time to which a representation must be presumed to refer. Cal. Ins. Code § 356.

    B. <u>Contractual Interpretation</u>

The provisions of the contract before the Court must be considered.

1    Unless it turns on the credibility of conflicting extrinsic
2    evidence or on underlying facts that are in dispute, the
3    interpretation of an insurance policy is solely a question of
4    law. Waller v. Truck Ins. Inc., 11 Cal.4th 1, 18 (1995); Parsons
5    v. Bristol Development Co., 62 Cal.2d 861, 865-66 (1965); Merced
6    Mutual Ins. Co. v. Mendez, 213 Cal.App.3d 41, 45 (1989).

7    Pursuant to California law, the first consideration is to
8    look at the language of the contract in order to ascertain the
9    plain meaning or the meaning that a layperson would ordinarily
10   attach to the language. Waller v. Ins. Exchange, Inc., 11 Cal.4th
11   at 18. This is in furtherance of the general principle that the
12   mutual intent of the parties at the time of contracting is to be
13   given effect, Cal. Civ. Code § 1636, and is to be inferred, if
14   possible, solely from the words of the contract, Waller, 11
15   Cal.4th at 18. It is the clear and explicit meaning of the
16   contractual provisions, interpreted in their ordinary and popular
17   sense, that is to govern unless words are used by the parties in
18   a technical sense or are given a special meaning by usage. Id.;
19   Cal. Civ. Code §§ 1636, 1638-39, 1644. Dictionary meanings, the
20   context of the entire policy, and a commonsense view to avoiding
21   absurd results may be useful to put the Court in the position of
22   a layperson and understand how he or she might reasonably
23   interpret the exclusionary language. MacKinnon v. Truck Ins.
24   Exchange, 31 Cal.4th 635, 649-50 (2003).

25       C. The Contract

26           1. Two References to Fraud

27   The principal contractual provision in question, and the
28   only one adverted to by the parties, is as follows:

2. CONCEALMENT, MISREPRESENTATION OR FRAUD

_____ This Coverage Form is void in any case of fraud by you at any time as it relates to this Coverage Form. It is also void if you or any other "insured," at any time, intentionally conceal or misrepresent a material fact concerning:

a. This Coverage Form;
b. The covered "auto";
c. Your interest in the covered "auto", or
d. A claim under this Coverage Form.

(Jt. Ex. 1 at 21.) Review of the policy (Jt. Ex. 1) reveals that this provision appears in Section V of the policy, entitled, "Truckers Conditions," which begins with the statement, "The following conditions apply in addition to the Common Policy Conditions." Id. at 20. The Common Policy Conditions constitute a separate part of the policy, (id. at 31), which is not entitled as an endorsement, but appears within a series of endorsements (id. at 26-39).[2] The Common Policy Conditions section begins, "All Coverage Parts included in this policy are subject to the following conditions." (Id. at 31.) Thus, the Truckers Conditions, which apply in addition to the Common Policy Conditions, appear to be intended to apply to all coverage parts of the contract. The Truckers Conditions include Loss Conditions (at 20-21), and General Conditions (at 21-22), of which the fraud provision is one.

Terms and provisions must be read in their ordinary and popular sense, but each must be interpreted in the context of the contract as a whole and the circumstances of the case. Bay Cities Paving & Grading, Inc. v. Lawyers Mut. Ins. Co., 5 Cal.4th 854,

---

[2] The Common Policy Conditions refer to matters such as cancellation, changes, examination of the insured's books and records, inspections and surveys, premiums, and transfer of rights and duties.

867 (1993).

There are no definitions in the policy pertaining to the pertinent contract terms of "concealment," "misrepresentation," "fraud," or "intentionally." (Id. at 22-24.) However, one other reference to fraud and misrepresentation appears in the policy's "CALIFORNIA CHANGES--CANCELLATION AND NONRENEWAL" endorsement, which is prefaced by following instructions:

> THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ
> IT CAREFULLY.

(Id. at 28.) The endorsement adds provisions to the Cancellation Common Policy Condition[3] and "modifies insurance provided under," among other types, businessowners policy, commercial auto coverage part, and pollution liability coverage part. Id. It is not clear that it applies to any particular coverage form in the instant policy; there is no reference to the truckers coverage form pursuant to which coverage was provided in the policy. However, it is an endorsement checked as applying to the instant policy. (Id. at 2.) With respect to "All Policies in Effect For More Than 60 Days," it provides:

> ...[W]e may cancel this policy only upon the
> occurrence, after the effective date of the policy,
> of one or more of the following:
> ....
> (2) Discovery of fraud or material misrepresentation
> by
>         (a) any insured or his or her representative
>         in obtaining this insurance; or
>         (b) You or your representative in pursuing
>         a claim under this policy.

(Id. at 29.)

---

[3] The cancellation provision in the Common Policy Conditions section states that all coverage parts are subject to cancellation by the insurer by delivery of ten days' or thirty days' notice, depending on the reason for cancellation; specifies the contents, effective date, and address for delivery of notice of cancellation; and provides for refund of premiums. (Jt. Ex. 1 at 31.)

1    It might be argued that the cancellation and nonrenewal
2  endorsement directly affects or modifies the provision regarding
3  the policy being void for concealment, misrepresentation, or
4  fraud that appears in the Truckers Conditions section. (Jt. Ex. 1
5  at 21). However, the cancellation and nonrenewal change
6  endorsement does not state that it modifies the Truckers
7  Conditions, the Truckers Coverage Form, or even the Common Policy
8  Conditions in general. Instead, it expressly adds provisions to
9  the Cancellation Common Policy Condition. (Id. at 28.) The
10  pertinent Common Policy Condition (Jt. Ex. at 31) is the one for
11  cancellation, which does not purport to define when the policy is
12  void or when the insurer may seek retroactively to avoid the
13  obligations of a policy that was never cancelled; instead, it
14  relates only to the process of cancellation itself after the
15  policy has been in effect for sixty days. Cancellation is a
16  prospective phenomenon; rescission is retroactive. See Fireman's
17  Fund American Insurance Co. v. Escobedo, 80 Cal.App.3d 610, 619
18  (1978). The clear linking of the two provisions indicates that
19  the two provisions permitting cancellation should be read
20  together. The plain meaning of the two cancellation provisions
21  read together is that after sixty days, the policy may be
22  cancelled for various stated grounds, which include fraud or
23  material misrepresentation.

24    The Court concludes that the endorsement regarding grounds
25  and procedures for cancellation does not directly affect the
26  provision in the Truckers Conditions section of the Truckers
27  Coverage Form that concerns when the policy may be declared void.
28  ///

2.  <u>Inconsistency between the Policy and
California Statutory Law</u>

Insurers and insureds are generally free to enter into
contracts that provide for coverage more favorable to the insured
than those permitted by statute. <u>Utah Property & Casualty Ins.
etc. Assn. v. United Services Auto. Assn.</u>, 230 Cal.App.3d 1010,
1023-24 (1991). It must be determined if by mentioning
intentional conduct in the contract as a basis for voiding the
contract, the parties intended to limit the rescission remedy to
intentional conduct and impose a stricter standard than that
permitted by statute, or whether the broad, statutory provision
was intended to remain in effect despite the contractual
language.

The contract does not expressly refer to the inconsistent
statutes noted hereinabove.[4]

The Court will first consider the contractual language.[5] The
contractual provision clearly and unambiguously states that the

---

[4]In other respects, the contract does refer to provisions of law. In the
liability coverage section of the Truckers Coverage Form, there are "Out-of-
State Coverage Extensions" that increase the limit of insurance and provide
for minimum amounts and types of other coverages required by laws of the
jurisdiction where a covered auto is being used (Jt. Ex. 1 at 15), and there
are coverage exclusions for any obligation of the insured pursuant to workers'
compensation, disability benefits, or unemployment compensation laws, (<u>id.</u> at
16). Endorsements also reflect "CALIFORNIA CHANGES" regarding primary coverage
in cases involving insureds in the auto-related businesses, (<u>id.</u> at 26);
cancellation and nonrenewal, (<u>id.</u> at 28-30); and California uninsured
motorists coverage-bodily injury, (<u>id.</u> at 37-39). The policy also refers to
uninsured motorist coverage in connection with a California Uninsured and
Underinsured Motorist Coverage Selection Form and an election form concerning
Uninsured Motorist-Property Damage Coverage. (<u>Id.</u> at 40-41.)

[5]As noted, the policy states that it is void in any case of "fraud... as
it relates to this Coverage Form," and it is also void if an insured at any
time "intentionally conceal[s] or misrepresent[s] a material fact concerning:
  a. This Coverage Form;
  b. The covered "auto";
  c. Your interest in the covered "auto", or
  d. A claim under this Coverage Form." (Jt. Ex. 1 at 21.)

coverage form is void in any case of fraud by the insured
relating to the coverage form, and it is also void if an insured
intentionally conceals or misrepresents a material fact
concerning the coverage form or other specific matters. Common
usage would indicate, and a reasonable layperson would
understand, that "void" means of no legal force or effect; the
reference to "fraud" denotes deceit or trickery; the use of
"intentional" means having an intention or purpose; the reference
to "concealment" denotes conscious prevention or avoidance of
disclosure; and the use of "misrepresentation" means a misleading
or untrue representation. <u>See</u> <u>Webster's Third New International</u>
<u>Dictionary of the English Language, Unabridged</u> (1986) at 2562,
904, 1176, 469, and 1445. The plain meaning of "fraud" would not
include an unintentional or negligent misrepresentation. Further,
a reasonable layperson would understand that the adjective
"intentional" modifies both "concealment" and
"misrepresentation." <u>See,</u> <u>Ward General Services, Inc. v.</u>
<u>Employers Fire Ins. Co.</u>, 114 Cal.App.4th 548, 554 (2003); <u>Tri-</u>
<u>State Ins. Co. of Minnesota v. H.D.W. Enterprises, Inc.</u>, 180
F.Supp.2d 1203, 1217 (D.Kan. 2001) (construing a provision
virtually identical with the one in the instant policy, and
noting that the goal of avoiding unreasonable results also
supports this construction). The plain meaning of the provision,
then, is that the coverage form is void if an insured engages in
fraud (trickery or deceit), intentional concealment, or
intentional misrepresentation.

Defendant argues that the policy does not state that it is
void "only" where the insured has intentionally concealed or

misrepresented material facts, and such a meaning is not necessarily implied; further, the policy provision speaks to when the policy is void, whereas an insurer may defend against a claim on the basis of concealment or misrepresentation without declaring the entire policy void.

It is true that the policy does not expressly state that it is void "only" in cases of intentional misrepresentation or concealment; further, it does not address "rescission," the distinction between void and voidable contracts, or the interrelationship of the various legal remedial concepts potentially involved in a formal legal analysis of these issues. However, the question to be determined is whether the policy is ambiguous in light of the context of the underlying California law. Arguably, the meaning of the provision is clear, and no further analysis should be required. Cf. Tri-State Ins. Co. of Minnesota v. H.D.W. Enterprises, Inc., 180 F.Supp.2d at 1217.

Whether a contract is ambiguous is a question of law for the Court. Airborne Freight Corp. v. McPherson, 427 F.2d 1283, 1285 (9th Cir. 1970); Winet v. Price, 4 Cal.App.4th 1159, 1164-65 (1992).

A policy is ambiguous when it is capable of two or more constructions, both of which are reasonable. Bay Cities Paving & Grading, Inc. v. Lawyers Mut. Ins. Co., 5 Cal.4th at 867. Defendant argues that a reasonable person could contend that even though the policy itself sets forth only one type of fraud as sufficient to avoid the contract, and thus to avoid coverage, the insurer nevertheless may in effect avoid the contract on lesser grounds not mentioned in the contract, or at least avoid any

1  legal effect of the contract based on misrepresentation of a
2  lesser type.

3      Even if it is assumed that an ambiguity is present, the goal
4  of interpreting a contract of insurance in California is
5  effectuating the intent of the parties. Cal. Civ. Code, §§ 1636,
6  1641. To that end, all parts of a contract are considered with
7  reference to each other and to the contract as a whole as well as
8  with reference to the subject of the contract and the
9  circumstances of contracting. Cal. Civ. Code §§ 1641, 1647.

10     If the policy provision is considered ambiguous, then it
11 must be interpreted in the sense that the promisor reasonably
12 believed that the promisee understood it at the time the policy
13 was issued, that is, whether the meaning is consistent with the
14 insured's objectively reasonable expectations. Bank of the West
15 v. Superior Court (Industrial Indemnity Co.), 2 Cal.4th 1254,
16 1264-65 (1992). It is not reasonable to conclude that the insured
17 would expect from the policy language that unmentioned, lesser
18 species of nondisclosure or misrepresentation would nevertheless
19 permit the insurer, under the rubric of a defense to specific
20 coverage as distinct from a wholesale avoidance of the contract,
21 nevertheless to argue that the contract was of no legal effect as
22 to the insured. This is not within the objectively reasonable
23 expectation of an insured layperson, who would understand from
24 the policy language that for the contract not to be binding, the
25 conduct would have to fraudulent or intentional.

26     It is established that insurance policies are subject to the
27 rule of construction applicable to all contracts, namely, to
28 construe them so as to give effect to all terms and not to render

1  them surplusage. <u>ACL Technologies, Inc. v. Northbrook Property &</u>

2  <u>Casualty Ins. Co.</u>, 17 Cal.App.4th 1773, 1785-86 (1993). The fraud

3  provision states that the policy is void if the insured

4  intentionally conceals or misrepresents a material matter. To

5  interpret it to mean that unintentional, or negligent,

6  misrepresentations also render the policy ineffectual would

7  remove any limiting effect of the provision and render the

8  specification of intentionality mere surplusage, a result not

9  only precluded by the pertinent canon of construction, but also

10 not within an insured's reasonable expectation.

11      This result is consistent with decisions in other

12 jurisdictions that have considered similar issues of construction

13 of policy provisions that set standards that were inconsistent

14 with, and more favorable to the insured than, analogous statutory

15 provisions. It has been held that where statutes permit

16 rescission or avoidance of liability under a policy on the ground

17 of innocent or negligent misrepresentations, a policy term

18 providing that the policy is void for fraud or intentional

19 misrepresentation or concealment will be given effect such that

20 intentional or fraudulent conduct is required for the insurer to

21 rescind or defend on the basis of nondisclosure or

22 misrepresentation. <u>See</u> <u>State Farm General Insurance Co. v.</u>

23 <u>Oliver</u>, 658 F.Supp. 1546, 1550 (N.D.Ala. 1987), <u>aff'd.</u> 854 F.2d

24 416, 419-20 (11th Cir. 1988) (a statute that provided that

25 misrepresentation, concealment, or omissions and incorrect

26 statements shall not prevent recovery under the policy or

27 contract unless either material to acceptance of the risk or the

28 hazard, or the insurer in good faith would not have issued the

14

policy or would not have issued it at the premium rate in question if the true facts had been known to the insurer as required either by the application or contract or otherwise, was held not to determine the meaning of the contract, where the contract by its terms provided that if an insured intentionally concealed or misrepresented a material fact, the policy was void as to the insured; the court reasoned that the insurer had contracted for something different and had contractually excused innocent misrepresentations in the application); Gainsco v. ECS/Choicepoint Services, Inc., 853 So.2d 491, 492-3 (Fla. 2003) (the policy provided that it was voidable for intentional concealment or misrepresentation, whereas the statute voided a policy without regard to the whether omission or concealment was intentional); Tri-State Ins. Co. of Minnesota v. H.D.W. Enterprises, Inc., 180 F.Supp.2d 1203, 1216-17 (D.Kan. 2001) (holding that a policy provision that the coverage form was void in case of fraud or intentional concealment or misrepresentation of a material fact unambiguously required intentional conduct to render the policy void such that inconsistent statutes would not be considered, but noting that the result would be the same if it were considered ambiguous because the language should be construed against the drafter); see also, Green v. Life & Health of Am., 704 So.2d 1386 (Fla. 1998) (policy concerned representations made to the best of the insured's knowledge and belief); Hauser v. Life General Security Ins. Co., 56 F.3d 1330 (11th Cir. 1995) (ERISA case, policy provision that concerned the insured's knowledge and belief); Simmons v. Conseco Life Ins. Co., 170 F.Supp.2d 1215, 1222 (M.D.Fla. 2001) (unintentional

misrepresentation by applicant regarding grade of prior convictions was held insufficient to permit the insurer to void the policy despite a statute permitting avoidance for innocent material misrepresentations because the policy affirmation regarding the truth of the representation was in terms of "best of the applicant's knowledge and belief" pursuant to the insurer's choice to draft a standard of truthfulness of representations that was less rigid than the statutory language).

The fact that many of the cases cited by Plaintiff rely on law other than California law does not render them inapplicable. It is understood that California law governs the construction of the instant contract. However, the out-of-jurisdiction cases involve issues of construction of statutes and contractual provisions that are analogous in varying degrees to those involved in the present case. The decisions show that various courts, applying rules of contractual construction similar to those of California, have concluded that insurers may choose to require less rigid standards of disclosure or representation in connection with the contracts in question, and that when they do so, their drafting choices will be construed in light of the reasonable expectations of the applicant for insurance and in furtherance of the principles that all language in a contract should be given effect and that ambiguous terms will be construed against the insurer who drafted them and in favor of coverage. The Court does not read these decisions as requiring insurers affirmatively to put statutory language in their contracts in order to avail themselves of statutory rights; rather, they pertain to situations in which the insurer has included in the

1  contracts in question language which is inconsistent with

2  statutory provisions.

3      Defendant relies on <u>Mitchell v. United National Insurance</u>

4  <u>Company</u>, 127 Cal.App.4th 457 (2005), in which the intermediate

5  appellate court was faced with reconciling two conflicting

6  statutes, both of which were applicable to a fire insurance

7  policy. Cal. Ins. Code §§ 331 and 359, which are applicable to

8  the type of policy involved in the present case, declare the

9  injured party is entitled to rescind insurance by "[c]oncealment,

10 whether intentional or unintentional," (§ 331), or for a

11 materially false representation (§ 359).

12     Two other statutes were involved in <u>Mitchell</u>. One was Cal.

13 Ins. Code § 2070, which provided that all fire policies "shall be

14 on the standard form" and shall not contain additions, and that

15 any peril coverage must be substantially equivalent to or more

16 favorable to the insured than that contained in the standard fire

17 insurance policy form. Cal. Ins. Code § 2080 stated that except

18 as provided in that article, clauses imposing specified duties

19 and obligations upon the insured and limiting the liability of

20 the insurer may be attached to the standard form as riders.

21 Section 2071, the standard fire insurance policy form, stated:

22         "Concealment, fraud: This entire policy shall be
           void if, whether before or after a loss, the insured
23         has willfully concealed or misrepresented any material
           fact or circumstance concerning this insurance or
24         the subject thereof, or the interest of the insured
           therein, or in case of any fraud or false swearing by the
25         insured relating thereto."

26 California case law established that in order to void a policy

27 based on the insured's violation of this fraud and concealment

28 provision, the false statement must have been knowingly and

17

1 willfully made with the intent (express or implied) of deceiving

2 the insurer, and the materiality of the statement would be

3 determined by an objective standard of its effect upon a

4 reasonable insurer. <u>Mitchell</u>, 127 Cal.App.4th at 634-35. Thus,

5 the insurer's right to void a fire insurance policy under § 2071

6 was more limited than the right to rescind accorded by §§ 331 and

7 359.

8 　　　In <u>Mitchell</u>, the court ruled that §§ 2070 and 2071 did not

9 preclude rescission by the insurer for unintentional

10 misrepresentation under the more liberal standard of rescission

11 set forth in §§ 331 and 359 1) because of legislative intent, 2)

12 because §§ 2070 and 2071 did not expressly exclude application of

13 other statutory provisions; 3) it made no sense to exclude a fire

14 insurance contract from the terms afforded by other statutes; 4)

15 the canon of statutory construction that different statutes

16 within the same code should be interpreted to be consistent; 5)

17 freedom of contract and the right of an insurer to make an

18 informed decision whether or not to insure a given risk were

19 strong policy considerations that support more liberal rescission

20 rights for misrepresentations made at the inception of the

21 insurance contract; and 6) §§ 331 and 359 apply to

22 misrepresentations made at any time but normally govern parties'

23 obligations during formation of the contract, whereas the

24 standard fire insurance fraud and concealment provisions

25 typically was exercised in connection with a claim for policy

26 benefits. <u>Id.</u> at 471-473. The court in <u>Mitchell</u> relied on cases

27 indicating a similar reconciling of two New York state statutes

28 permitting rescission by the insurer for material

1  misrepresentations on the one hand but otherwise voiding fire
2  policies in the event of the insured's willful concealment or
3  misrepresentation of a material fact.

4      In contrast, in the present case, the issue is not
5  reconciling two conflicting statutes; rather, it is determining
6  the appropriate construction of a contract in light of its terms.
7  The governing object is not to attempt to reconcile inconsistent
8  statutes, but rather to give effect to the expressed intent of
9  the parties, and to consider statutory limitations on coverage
10 only as appropriate in the course of construction of the
11 contractual language.

12     Review by the California Supreme Court was not sought in
13 Mitchell.

14     Mitchell was followed in Atmel Corporation v. St. Paul fire
15 & Marine, 426 F.Supp.2d 1039 (N.D.Cal. 2005), where an errors and
16 omissions policy stated that the policy was void if specified
17 persons hid important information or attempted to defraud or lie;
18 the policy stated that everyone made mistakes and that
19 unintentional errors or omissions would not affect the insured's
20 rights under the policy. The insured, who allegedly had provided
21 inaccurate information in the application process, argued that
22 the insurer had waived its statutory right to rescind for
23 anything but intentional fraud. The court concluded that it was
24 not a waiver of a statutory right to material information because
25 the insurer asked specific questions in the application. The
26 court relied on Mitchell as holding similar language inapplicable
27 to rescission of a policy based on misrepresentation and
28 concealment in a policy application. The Court followed Mitchell

because even though <u>Mitchell</u> was different because it concerned language from two statutes, as distinct from contractual language and statutory language, there was "nevertheless no persuasive or logical reason to arrive at a different interpretation of a very similar clause in this case." 426 F.Supp.2d at 1050. The Court also stated that common sense dictated that the fraud and misrepresentation clause, which was contained in the policy issued after the application had been approved, did not apply to misrepresentation or concealment in an insurance application. <u>Id.</u>

The <u>Atmel</u> decision is not persuasive because it really did not analyze the different canons of construction applicable in the two types of cases (construction of a contract which conflicted with statutory language, versus construction of language in a contract which was based on and required by statutes). In <u>Mitchell</u>, the California legislature had directed that the pertinent portion of the contract be included. In the present situation, private parties wrote the contract, which is to be construed in light of the intent of the parties as reasonably manifested in contractual language; statutory language here was not mandated as part of a contract, but rather was merely background which the parties were free to supercede by the use of contractual terms.

Mitchell has been criticized. Although <u>Mitchell</u> succeeded in avoiding different rescission standards for fire insurance than for other coverages in the same policy, the result may be contrary to settled rules of statutory construction because the specific provision of § 2071 dealing with fire insurance should control over contrary provisions in §§ 331 and 339 dealing with

1 insurance generally, <u>Miller v. Superior Court</u>, 21 Cal.4th 883,

2 895 (1999); and § 2071 should have controlled over the earlier

3 enacted sections 331 and 359, <u>see</u>, Croskey and Kaufman,

4 <u>California Practice Guide: Insurance Litigation</u> at 5:172 (Rutter,

5 2005).

6     Defendant argues that as in <u>Mitchell</u>, it is appropriate to

7 give effect to the statutes giving the insurer a broader right to

8 void a contract to the application process. However, despite the

9 statutory policy in favor of disclosure at the inception of the

10 contract identified in <u>Mitchell</u>, <u>Mitchell</u> also recognized the

11 policy supporting the freedom of contracting. Here, the insurer

12 freely chose to include language more favorable to the insured

13 that is reasonably understood as limiting the circumstances under

14 which the insurer may assert that the contract is of no effect

15 based on nondisclosure or misrepresentation.

16     When contracting parties use terms that provide for broader

17 coverage than that otherwise provided by reference to statute,

18 those terms are regularly interpreted to provide broader

19 coverage. <u>Mission v. Coachella</u>, 210 Cal.App.3d 484 (interpreting

20 "efficient proximate cause" in a coverage clause as referring to

21 a predominating cause, which resulted in broader coverage, as

22 distinct from a triggering cause, which would have resulted in a

23 more restrictive scope of coverage consistent with judicial

24 interpretations of Ins. Code § 530 and 532); <u>State Farm Casualty</u>

25 <u>Co. v. Martin</u>, 872 F.2d 319, 321 (9th Cir. 1989) (interpreting a

26 contractual term that excluded losses from concurrent causes more

27 strictly than the statute, Ins. Code § 530, which the court noted

28 would correctly have been implied as the meaning of the policy

21

only in the absence of contractual language to the contrary). It is established that in the absence of any general declaration of public policy, there is no reason to interfere with the parties' full freedom to contract for coverage on any terms not specifically prohibited by statute. National Insurance Underwriters v. Carter, 17 Cal.3d 380, 387-88 (1976).

Although statutory terms may be incorporated into a contract, this is applied to find coverage required by statutes where insurance policies otherwise do not afford coverage. Utah Property and Casualty Insurance Guaranty Association v. United Services Automobile Association, 230 Cal.App.3d 1010, 1019-20 (1991) (collecting cases). A limitation on coverage contained in a statute will not be implied into a policy that lacks such a limitation where a layperson reading the policy would have no reason to suspect the limitation would apply. Utah Property and Casualty Insurance Guaranty Association v. United Services Automobile Association, 230 Cal.App.3d 1010, 1015-16 (not implying a statutory one-year time limit for uninsured carriers to become insolvent into a policy providing for coverage of insolvent insurers' responsibilities). Where statutory provisions set a minimum or floor amount of coverage, statutory exclusions or limitations intended to provide a ceiling must be expressly, clearly, and plainly incorporated into a policy. Utah Property, 230 Cal.App.3d at 1017. Less favorable coverage provisions of a statute will not be read into the policy to the insured's detriment. Id. at 1018. A policy or its endorsements cannot be so interpreted as to become meaningless, or to withhold coverage normally expected by a layperson with an ordinary mind.

Continental Casualty Co. v. Phoenix Construction Co., 46 Cal.2d
423, 437-38 (1956).

Laypersons cannot be expected to know of statutory
limitations or exclusions on coverage not contained in their
insurance policies; a rule invalidating lay persons' trust in the
language of their policies would result in unanticipated gaps in
coverage at the least. Utah Property, 230 Cal.App.3d at 1021.
Insurers, who are fully capable of knowing about statutory
restrictions on coverage and of incorporating those statutory
restrictions in the language of their policies, may fairly be
expected to use clear and express language incorporating
statutory restrictions. Id. Even where a statute expressly
purports to limit express contractual provisions contrary to its
own terms, any limit upon freedom of contract is narrowly
construed. Henricks v. Metropolitan Life Ins. Co., 7 Cal.2d 619,
632 (1936) (upholding the validity of a construction of a
contract that provided an alternative different from and in
addition to, but not contrary to, statute which prohibited terms
"contrary to" the statute).

Focusing on the use of the word "void" in the contract, and
the reference to rescinding in § 331, Defendant argues that the
provision specifying that the policy is void does not impliedly
negate ICW's right under the law alternatively to rescind, or
defend on grounds that the risk was misrepresented.

Defendant's argument rests on two prongs. Defendant asserts
that the statutory and decisional law in force at the time a
policy is issued must be read into each policy with full binding
effect. Defendant cites to Interinsurance Exchange v. Ohio Cas.

23

Ins. Co., 58 Cal.2d 142, 147-48 (1962), in which a customer of an insured car dealer who was involved in an accident was excluded under the terms of the dealer's policy, a policy written at a time when the applicable statutory law, public policy, and decisional law required coverage of permissive users. At the time of the accident for which coverage was sought, the statute had been amended. It was held that even if it were assumed that the amendment had changed the public policy, it could not have retroactively validated an agreement that was either void, or unenforceable, pursuant to the statutory law in effect when it was written. Id. at 146-47. The permissive user coverage discussed in Interinsurance Exchange v. Ohio Cas. Ins. Co. was minimum coverage required as a matter of public policy for the protection of insured parties and their permittees. In contrast, in the present case, the policy provision limiting the circumstances in which policies were void did not violate any public policy requiring that insurers be given enumerated rights or privileges, but rather was within the realm of matters subject to the parties' bargaining and prerogatives to agree on coverage more favorable to the insured. Cf. National Ins. Underwriters v. Carter, 17 Cal.3d 380, 388 (1976), in which it was stated, "[I]n the absence of any general declaration of public policy ... we discern no reason to interfere with the parties' full freedom to contract for coverage on any terms not specifically prohibited by statute"; Utah Property & Casualty Ins. etc. Assn. v. United Services Auto. Assn., 230 Cal.App.3d 1010, 1023-24 (collecting cases, considering a policy that did not limit a period of insolvency protection and an uninsured motorists statute that

limited it to a one-year period, and concluding that as
reasonably anticipated by a layperson and consonant with public
policy, the policy provided greater coverage than that required
by law and did not incorporate an exclusion or limitation not
stated in the policy).

Defendant does not cite, and the Court is unaware of, any
authority either requiring a lay person in the position of the
insured to read into a policy a statutory provision that would
put more restrictive limits on coverage than those stated in a
policy, or recognizing a public policy that would preclude a
condition that was more favorable to the insured and provided
coverage except with respect to _intentional_ concealment in
circumstances such as those in the present case. Such a position
would be contrary to established principles that a policy should
be interpreted in light of the expectations of a reasonable
insured person, not a reasonable attorney or insurance expert,
Crane v. State Farm Fire & Cas. Co., 5 Cal.3d 112, 115 (1971),
and not necessarily one with knowledge of subtle legal
distinctions, Safeco Ins. Co. of America v. Robert S., 26 Cal.4th
758, 765-66 (2001) (declining to conclude that an insured's
reasonable expectations would include understanding of the
distinction between gross and ordinary negligence).

Defendant also argues that because the policy provision
voids the policy for intentional concealment or
misrepresentation, and because an insurer need not rescind for
misrepresentation or concealment but may take advantage of an
alternate remedy of defending against a claim on the policy on
the basis of misrepresentation or concealment, the policy

provision should be interpreted only to affect the remedy of
rescission and not the alternate remedy of defending against a
claim on the policy. Defendant cites De Campos v. State Comp.
Ins. Fund, 122 Cal.App.2d 519, 528 (1954). In De Campos, the
court upheld a judgment for an insurer against an insured
employer. The insurer had previously unsuccessfully litigated a
worker's compensation action against heirs of an employee who
died in the scope of employment. The insurer had refused to
defend the insured employer in the worker's compensation action,
but no issue of fraud or misrepresentation by the insured
employer had been raised in the worker's compensation case. When
the insured employer brought an action against the insurer for
the employer's costs of defending itself in the worker's
compensation action, the insurer took the position that coverage
for the decedent had been excluded by various policy provisions,
and that the policy had issued based on material concealment by
the insured employer of 1) the decedent's status as an excluded
partner (which was found to have been an ambiguous exclusion and
was resolved against the insurer), and 2) the decedent's
compensation, which was a basis for assessment of the risk and
should have been figured into the premium cost. When the insured
employer sued the insurer on the policy for the costs of its
defense, the insurer defended because 1) the policy was not in
effect because of fraud (of the intentional variety), 2) the
employer waived its contractual right to a defense under the
policy and was estopped to seek it because of the fraud and
breach of warranty, and 3) the employer was in breach and
default, and thus could not seek performance of the contract. The

insurer also claimed damages from the employer for the fraud. In upholding the trial court's judgment for the insurer based on fraud, the Court noted that the insurer had alternate, inconsistent remedies for damages or rescission; the court characterized the damages action as one on the contract for breach of contract, and it relied on the fact that insurer there had not argued that there was no contract, but in fact had argued that the contract was in effect, but that the decedent had been excluded based on his status. (Id. at 525-27.)

In the present case, the Defendant insurer is not defending against a claim brought by a policy holder; rather, it is resisting a third party insurer's claim for reimbursement or contribution. The basis of Defendant's resistance is that Defendant's obligation under the policy, or policy coverage, may be avoided because of the insured's concealment or misrepresentation of a material matter; Defendant is not seeking damages on the contract. To the extent that Defendant is relying on the contract, it is resorting to the provision that permits the policy to be declared void for fraud or intentional concealment or misrepresentation.

In any event, under the pertinent California law, the intricacies of the terminology and substance of the law of remedies do not necessarily determine the interpretation of the policy provision according to the reasonable expectations of a lay insured, who is not in the position to recognize and appreciate fine distinctions pertaining to alternate legal remedies not referred to in the contract. A reasonable insured would understand the provision to exclude coverage on the basis

27

of fraud, and not to constitute a partial reference to one of a multitude of legal remedies. Likewise, a reasonable insured layperson would not expect the provision to describe situations in which the contract is void, as distinct from voidable or subject to rescission, or to distinguish among remedies which are based on the invalidity of the contract due to fraud but which arise in different procedural contexts or differ in some manner with regard to legal scope or effect.

Finally, if there is ambiguity with respect to coverage, a contract may be interpreted most strongly against the party who caused the uncertainty to exist, Cal. Civ. Code § 1654, and specifically against the insurer, in order to protect the insured's reasonable expectation of coverage in a situation in which the insurer-draftsman controls the language of the policy. Accordingly, coverage language is interpreted in its most inclusive sense, and exclusions in a policy are narrowly interpreted. Mission National Insurance Co. v. Coachella Valley Water District, 210 Cal.App.3d 484, 496-7 (1989). An insurer has an obligation to use such language as to make the conditions, exceptions and provisions of a policy clear to the ordinary mind engaging in a plain, commonsense reading of the terms; if the insurer's language should fail, any ambiguity or reasonable doubt must be resolved in favor of the insured and against the insurer. It is established that ambiguous terms are resolved in the insured's favor, consistent with the insured's reasonable expectations. Safeco Ins. Co. of America v. Robert S., 26 Cal.4th 758, 763 (2001); Pacific Heating and Ventilating Co. v. Williamsburgh City Fire Ins. Co. of Brooklyn, 158 Cal. 367, 370

(1910); <u>Paramount Properties Co. v. Transamerica Title Ins. Co.</u>, 1 Cal.3d 562, 569 (1970).

Applying these canons, Plaintiff's construction, namely, that the contract provided for the insurer to avoid coverage on the basis of concealment or misrepresentation only for intentional or fraudulent conduct, should be adopted because Defendant drafted, or was responsible for the wording of, the contract, and the Defendant is the insurer. Had Defendant wanted to have a broader ground upon which to avoid the contract for merely negligent or fully innocent conduct, Defendant could have said nothing, or Defendant insurer could have specifically provided that all forms of nondisclosure and misrepresentation would have been a basis for voiding the contract.

The Court concludes that in order to prevail on its defense, Defendant must show that the insured engaged in intentional concealment or intentional misrepresentation with respect to the coverage form.

IV. <u>Intentional Concealment or Misrepresentation</u>

The Defendant asserts that G&P misrepresented that Pannu was the only driver and concealed the fact that Inderjit was also a driver.

Plaintiff argues that the intentional element of intentional misrepresentation or concealment is defined by California Jury Instructions, Civil, Book of Approved Jury Instructions [BAJI], January 2005 Edition, § 12.31, which defines the essential elements of a claim of fraud by an intentional misrepresentation as including a false representation with respect to which:

3. The defendant (here G&P) must have known that the

representation was false when made [or must have made the
representation recklessly without knowing whether it was
true or false];

4. The defendant (here G&P) made the
representation with an intent to defraud the plaintiff,
that is, [he] [she] (here G&P) must have made
the representation for the purpose of inducing the
plaintiff to rely upon it and to act or to refrain from
acting in reliance thereon....

Id., BAJI 12.31. The Court notes that BAJI 12.35 states that the

essential elements of a claim of fraud by concealment include

concealment or suppression of a material fact that the defendant

was under a duty to disclose to the plaintiff and as to which:

3. The defendant (here G&P) intentionally concealed
or suppressed the fact with the intent to defraud
the plaintiff.

The Court further notes that California Jury Instructions,

Civil, January 2005 Edition, CACI 335 governs the affirmative

defense of fraud that vitiates consent and prevents formation of

a contract. It states in pertinent part that to succeed in the

defense, the defendant must prove with respect to the plaintiff's

representation:

2. That [G&P] knew that the representation was
not true;
3. That [G&P] made the representation to persuade
[ICW] to agree to the contract;
4. That [ICW] reasonably relied on this representation; and
5. That [ICW] would not have entered into the contract
if [it] had known that the representation was not true.

Plaintiff also cites to Kentucky Cent. Life Ins. Co. v.

Marin Bay Park Trust, 958 F.2d 377 (9th Cir. 1992) (unpublished

disposition) (TABLE, TEXT IN WESTLAW, NO. 91-15004, 91-15276), to

the effect that although an insured must read the contract and

report any misrepresentations or omissions, a contract may not be

rescinded by an insurer if the insured in good faith gives

30

answers that are truthful but, owing to the fraud, mistake, or negligence of the  insurance company's agent filling out the application, are incorrectly transcribed, or if the agent gave the insured the impression that additional responses were unnecessary.

Here, there does not appear to be evidence that Mirko was the insurer's agent; rather, she was the insured's agent.

Defendant argues that the requirements for making out the defense should be governed by California Jury Instructions, Civil, January 2005 Edition, CACI 2308 (revised October 2004), rescission for misrepresentation or concealment in an insurance application, which does not necessarily require intentional misrepresentation or concealment. Defendant also criticizes Plaintiff's citation of an unpublished case (<u>Kentucky Cent. Life Ins. Co. v. Marin Bay Park Trust</u>), and Defendant notes that the case involved life and disability insurance, which by statute (Cal. Ins. Code § 10380) requires intentional falsity in an insurance application. However, these points are based on an assumption that Cal. Ins. Code § 331 governs the Defendant's right to rescind, and it is untenable in light of the Court's previously discussed construction of the contract to provide more favorable insurance coverage than that provided by Cal. Ins. Code § 331.

The BAJI and CACI instructions regarding intentional misrepresentations or concealment accurately reflect California law, namely, that a representation or concealment must be accomplished "with intent to deceive another party thereto, or to induce him to enter into the contract"; and the action may be

31

either "[t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true... or "[t]he suppression of that which is true, by one having knowledge or belief of the fact...." Cal. Civ. Code § 1572. A fraudulent misrepresentation is one made with the knowledge that it is or may be untrue. <u>Seeger v. Odell</u>, 18 Cal.2d 409, 414 (1941).

V. <u>Materiality of Misrepresentation or Concealment</u>

The materiality of a representation is determined by the same rule as the materiality of a concealment. Cal. Ins. Code § 360.

Materiality is a question of law. <u>Merced County Mut. Fire Ins. Co. v.State of California</u>, 233 Cal.App.3d 765, 772 (1991).

The California Insurance Code contains multiple provisions regarding disclosures that are required. Cal. Ins. Code § 332 provides:

> Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining.

Cal. Ins. Code § 333 provides that absent inquiry, neither party is bound to communicate things that are waived or which pertain to risks excluded by warranty, or which the other knows or ought to know and of which the party has not reason to suppose the other ignorant.

Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his

inquiries. Cal. Ins. Code § 334. The question is whether or not the matter misstated or concealed could reasonably be considered in affecting the insurer's decision as to whether or not to enter into the contract, in estimating the degree or character of the risk, or in fixing the premium. Holz Rubber Co. Inc. v. American Star Ins. Co., 14 Cal.3d 45, 61 n. 16 (1975). Materiality has been found where had the true facts been disclosed, the insurer would not have provided coverage without an exclusion of the misrepresented matter. Williamson & Vollmer Engineering, Inc. v. Sequoia Ins. Co., 64 Cal.App.3d 261, 272-74 (1976) (materiality established where a professional liability insurer demonstrated that a policy that had issued based on concealment of a pending claim would have contained an exclusion for the concealed claim).

The test is subjective in the sense that the critical question is the effect truthful answers would have had on ICW, not on some average reasonable insurer. Imperial Casualty & Indemnity Co. v. Sogomonian, 198 Cal.App.3d 169, 181 (1988).

It has been held in California that if an insurer asks specific questions on an application, this is usually sufficient to establish that the answer is material as a matter of law because the insurer asked for the information. Thompson v. Occidental Life Ins. Co., 9 Cal.3d 904, 916 (1973) (quoting Cohen v. Penn Mutual Life Ins. Co., 48 Cal.2d 720, 726 (1957)(where the insured, in applying for a life insurance policy, had misrepresented his history of a heart condition, and where the insurer had asked specific questions regarding not only diagnosed conditions, but also suspicious circumstances or symptoms)). However, it does not appear that the single circumstance of the

insurer's having asked a question on an application is sufficient to determine the materiality issue because courts have undertaken further analysis of additional pertinent circumstances. <u>Ransom v. Penn. Mutual Life Ins. Co.</u> 43 Cal.2d 420, 426-27 (1954); <u>Imperial Casualty & Indemnity Co. v. Sogomonian</u>, 198 Cal.App.3d at 180-81.

Even where lip service is given to the determinative character of the factor of asking for information, the California courts nevertheless complete a more thorough analysis of the materiality question, <u>Cohen</u>, 48 Cal.2d at 726-28 (focusing on the nature of the misrepresentation); <u>Thompson</u>, 9 Cal.3d at 916-918 (considering the questions, the testimony of medical witnesses, and all inferences).

It is acknowledged that an incorrect answer on an insurance application does not alone give rise to the defense of fraud where the true facts, if known, would not have made the contract less desirable to the insurer. <u>Thompson v. Occidental Life Ins. Co.</u>, 9 Cal.3d 904, 916 (1973); <u>California-Western States Life Ins. Co. v. Feinstein</u>, 15 Cal.2d 413, 423-24 (1940); <u>Imperial Casualty & Indemnity Co. v. Sogomonian</u>, 198 Cal.App.3d at 181.

It has also been emphasized in connection with such analysis that the trier of fact is not required to believe the "post mortem" testimony of an insurer's agents that insurance would have been refused had the true facts been disclosed. <u>Thompson</u> at 916.

Thus, the more reasoned view is that the fact that information was solicited on an application for insurance is a factor to be considered in determining materiality, but it is not the sole factor; determination of materiality remains a question

to be determined based on a multitude of factors.

A misrepresentation of loss history or drivers' qualifications may be material. Certain Underwriters at Lloyd's v. Montford, 52 F.3d 219, 222 (9th Cir. 1995) (concealment of history of a previous total loss claim in application for marine insurance); Civil Service Employees Ins. Co. v. Blake, 245 Cal.App.2d 196, 198 (1966) (casualty policy, driver's health history and history of driver's license revocation and denial); Allstate Ins. Co. v. Golden, 187 Cal.App.2d 506, 512 (1960) (auto policy, concealment of prior suspension of driver's license for speeding).

If the applicant for insurance had no present knowledge of the facts sought or failed to appreciate the significance of information related to him that formed the basis of his answers, his incorrect or incomplete responses would not constitute grounds for rescission. Thompson, 9 Cal.3d at 916.

As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other. Cal. Civ. Code § 2332. Awareness of an insured's agent that information is important or material may be imputed to the insured; thus, a duty to communicate information pursuant to Cal. Ins. Code § 332 may rest upon the agent's knowledge, and belief in the materiality of withheld facts may be based on the belief of an authorized agent. Merchants Fire Assurance Corp. v. Lattimore, 263 F.2d 232, 240-41 (9th Cir. 1959).

The burden of proving misrepresentations is on the insurer.

1   Thompson 9 Cal.3d at 919.

2        VI. Agency

3        The existence and scope of an agency is generally a question

4   of fact, Brokaw v. Black-Foxe Military Institute, 37 Cal.2d 274,

5   278 (1951), unless the essential facts are undisputed and subject

6   to only one inference, in which case it is a question of law,

7   Van't Rood v. County of Santa Clara 113 Cal.App.4th 549, 562

8   (2003).

9        A. Broker

10       An insurance broker is a person who, for compensation and on

11   behalf of another person, transacts insurance other than life

12   insurance with, but not on behalf of, an insurer. Cal. Ins. Code

13   § 33. Insurance brokers who lack authority to bind the insurance

14   company are not agents of the insurance company, but rather are

15   independent contractors acting only on behalf of the insured and

16   not the insurer. Rios v. Scottsdale Ins. Co., 119 Cal.App.4th

17   1020, 1026 (2004); Marsh & McLennan of Calif., Inc. v. City of

18   Los Angeles, 62 Cal.App.3d 108, 117-18 (1976).

19       B. Agent

20       The most definitive characteristic of an insurance agent is

21   the agent's ability to bind the agent's principal, the insurer.

22   Marsh & McLennan of Calif., Inc. v. City of Los Angeles, 62

23   Cal.App.3d at 118.

24       VII. Language Difficulty and Duty to Read the Contract

25       Generally an insured has a duty to read a policy and report

26   any misrepresentations or omissions as part and parcel of the

27   duty to engage in fair dealing with respect to the contract.

28   Telford v. New York Life Ins. Co., 9 Cal.2d 103, 107 (1937).

Even where misrepresentation or concealment need not be intentional to constitute a defense, rescission of a contract is not permitted for an incorrect or incomplete response if the applicant had no present knowledge of the facts sought or failed to appreciate the significance of information related to him. Trinh v. Metropolitan Life Insurance Co., 894 F.Supp. 1368, 1373 (N.D.Cal. 1995). Where an applicant, acting in good faith, does not understand the significance of the information he fails to disclose, the applicant is not at fault. Id. Further, an illiterate applicant, or one who does not speak the language in which the policy is written, may not be charged with failing to read the insurance application of agreement. See id. (and California authorities there cited).

VIII.  Named Driver Exclusions

Cal. Ins. Code § 11580.1(b)(4) and (d)(1) requires that every policy of automobile liability insurance shall contain insurance for any person using a covered motor vehicle, provided the use is by the named insured or with his or her permission, express or implied, and within the scope of the permission; however, exceptions may be effected by designating an excluded driver by name. This requires coverage for all permissive users and only authorizes exclusions for specifically named drivers.

Assuming for the sake of argument that this provision applies to the policy in issue in the present case, the Court notes that ICW cites several cases (ICW F. & C. at 25-26) which concern coverage that was inconsistent with that mandated by statute, not coverage limited by a named driver exclusion within the scope of the statute. See Metz v. Universal Underwriters Ins.

37

1  <u>Co.</u>, 10 Cal.3d 45, 50-53 (1973) (exclusion of coverage of

2  vehicles while rented to others, or used by permissive users with

3  other insurance); <u>Hertz Corp. v. Home Ins. Co.</u>, 14 Cal.App.4th

4  1071, 1078 (1993) (driving while intoxicated); <u>C.S.A. etc. v.</u>

5  <u>Gong</u>, 162 Cal.App.3d 518, 528 (1984) (concerning limitations of

6  liability for permissive use of non-owned vehicles); <u>Contreras v.</u>

7  <u>America, Compania General De Seguros, S.A.</u>, 48 Cal.App.3d 270,

8  281 (1975) (exclusion of liability for injuries to occupants of

9  the insured vehicle found invalid); <u>Glens Falls Ins. Co. v. Globe</u>

10 <u>Indemnity Co.</u>, 276 Cal.App.2d 643, 645-48 (1969) (provision

11 regarding permissive users loading or unloading a vehicle). Thus,

12 although a policy limitation against permissive users would have

13 been inconsistent with statute and in contravention of the public

14 policy to protect permissive users and third parties, it is not

15 clear that the same could be said about a warranty by G&P not to

16 permit Inderjit Singh to drive, coupled with a named driver

17 exclusion within the terms of the statute.

18    IX. <u>Cancellation</u>

19    Cancellation is termination of coverage by an insurer (other

20 than termination at the request of the insured) during a policy

21 period. Cal. Ins. Code § 660(g). Policies of insurance generally

22 may be cancelled only by mutual consent or if the right to do so

23 is reserved in the policy or is authorized by statute. <u>Spott</u>

24 <u>Electrical Co. v. Industrial Indem. Co.</u>, 30 Cal.App.3d 797, 806

25 (1973). Subject to legislative restriction, parties may agree on

26 the cause, method, and means of cancellation. <u>Jensen v. Traders &</u>

27 <u>General Ins. Co.</u>, 52 Cal.2d 786, 790 (1959). Although a statute

28 limits the grounds upon which an insurer may cancel automobile

38

insurance for nonpayment of premiums, fraud, or material
misrepresentation affecting the policy or the insured, or a
substantial increase in the hazard insured against, Cal. Ins.
Code § 1861.03(c), this statute does not apply to commercial
motor vehicles, as distinct from private passenger vehicles,
National Indemnity Co. v. Garamendi, 233 Cal.App.3d 392, 404-06
(1991).

Pursuant to Cal. Ins. Code § 676.2(b), an insurer may cancel
commercial insurance for any reason in the first sixty days; the
statute limits the form of cancellation notices and the grounds
for cancellation or policies that have been in effect for more
than sixty days. After sixty days of the policy being in effect,
no notice of cancellation shall be effective unless it complies
with Cal. Ins. Code § 677.2[6] and is based on the occurrence,
after the effective date of the policy, of nonpayment of premium;
a judgment by a tribunal that the named insured has violated a
California law by an act that materially increases any of the
risks insured against; discovery of fraud or material
misrepresentation by the insured or his or her representative in
obtaining the insurance or in pursuing a claim under the policy;
discovery of willful or grossly negligent acts or law violations
which materially increase the risk; failure to implement loss
control; a change by the named insured or his or her
representative in the activities or property of the commercial or
industrial enterprise which results in a material added risk, a

---

[6] Section 677.2 requires all notices of cancellation to be in writing, be mailed to the named insured at a specified address, state the effective date of cancellation and the reasons therefor, and be given at least thirty days prior to the effective date of the cancellation (except notice ten days before the effective date is sufficient for cancellation for fraud or nonpayment of premiums).

materially increased risk or a materially changed risk, unless the added, increased, or changed risk is included in the policy; or various determinations by the insurance commissioner. After a policy has been in effect for more than sixty days, no increase in rate or change in conditions of coverage shall be effective unless written notice is delivered at least thirty days prior to the change. § 676.2(c). The same statute limits the procedures for implementing a premium or rate increase; a premium increase may occur if it is calculated on the basis of a current rating manual and is justified by a physical change in the insured property or by a change in the activities of the commercial or industrial enterprise which materially increases any of the risks insured against. Cal. Ins. Code § 676.2(c), (e).

Witnesses testified that a policy could be cancelled for a material increase in hazard. The policy permitted this (Cancellation and Nonrenewal Endorsement), as did statute (Cal. Ins. Code § 676.2 [violation of law causing serious accident, resulting in material increase of hazard]).

_____ICW argues that the failure to cancel was not probative of a lack of materiality because ICW would in any event have the option to keep the policy in effect and defend any later claim of loss on the basis of fraud. During the period of time in question, however, ICW asserts that it did not discover the alleged fraud. Thus, it is not clear how ICW's asserted right to determine which remedy to utilize is material to this period of time. However, if it were material, one logical possibility regarding ICW's lack of awareness of the alleged fraud is that ICW did not know because it did not bother to investigate the

40

status of Inderjit as a driver. The Court has rejected the
factual claim that ICW was informed or knew that Inderjit no
longer was driving for G&P. Thus, the failure to investigate as
well as the failure to cancel would seem to be pertinent to the
issue of materiality of the alleged concealment.

Further, even if it is true that an insurer could choose to
maintain the policy but not accept the risk because of a failure
or breach of condition (ICW's term, post-trial brief p. 37), here
the issue is not a choice of remedy, but rather a question of
drawing an inference as to materiality based on post-application
conduct (failure to ascertain drivers, investigate, cancel).
Although there might not have been an obligation to cancel, that
should not negate the probative force of an inference from the
failure to investigate or cancel when legally entitled to do so.

The authorities cited by ICW go more to waiver than to lack
of an inference of non-materiality. The cases cited by ICW are
factually distinct. Purefoy v. Pacific Auto Indem. Exchange, 5
Cal.2d 81 (1935) held that the trial court correctly ruled that
an insurer could defend against the suit of a third party, which
had sued and received a favorable judgment against the insured
for an injury otherwise covered by insurance, based on the
insured's failure to give timely notice of the claim as required
by the policy, even though the insurer retained the premium after
it knew that the accident had happened; retention of the premium
may not have been a waiver of the earlier failure to give notice,
but rather a waiver of right to rescind and thereby not cover
future accidents at all; and it should be noted that the insured
was still unavailable/unlocated for a substantial portion of the

policy period thereafter); <u>Allstate Ins. Co. v. Golden</u>, 187

Cal.App.2d 506, 512 (1960) was a case where the insured

misrepresented his driver's license history; the insurer reserved

rights because of that with respect to an accident while

investigating the accident and then instituted an action to

rescind three months after the accident, cancelling the policy

pursuant to a policy provision at a later time (thereby

considering the policy in force at some time period after the

accident); it was held that some coverage that existed during the

cancellation notice period (between the sending of the

cancellation letter and the effective date of the cancellation)

did not preclude the insurer's reliance on the misrepresentation

earlier); <u>Resure, Inc. v. Superior Court</u>, 42 Cal.App.4th 156, 161

(1996), involved the insurer's suit to rescind the contract, and

the court interpreted a California Insurance Code provision

requiring an insurer to exercise the right to rescind before

action on the contract to mean that the rescission had to be

exercised before the insured sued to enforce the contract in an

action at law; the statute was also interpreted to require an

insurer being sued on the contract at law to raise the contract

as a defense in the action at law instead of beginning a new

action in equity; it was not a bar that the insurer had not

offered to return the premium earlier, had defended against a

third party who had sued the insured on the merits and had

initiated another coverage action earlier, and had defended other

actions against the insured with a reservation of rights; the

insurer could be made whole regardless); in <u>Williamson & Vollmer</u>

<u>Engineering, Inc. v. Sequoia Ins. Co.</u>, 64 Cal.App.3d 261 (1976),

42

it was held that the insurer could not be forced to pay for costs of defense and indemnification, even though when it learned of the concealment on the claim in question, it undertook defense of another claim and renewed coverage for another term; it was permissible to reform the policy to exclude the concealed matter because rescission was not the only remedy, and the insurer could be made whole); in Barrera v. State Farm Mut. Automobile Ins. Co., 71 Cal.2d 654, 681 (1969), it was held that the insurer's failure to undertake a reasonable and prompt investigation of insurability resulted in loss of the insurer's right to rescind (which would affect responsibility to injured third parties), but it did not preclude cancellation regarding the future; further, as against the insured, the insurer might still prosecute a cause of action for damages for wrongful misrepresentation after satisfying the injured person's claim, or, in an action brought by the insured, after he has satisfied a judgment against him by the injured person, might defend on the ground of misrepresentations in the application).

The fact that multiple remedies for a claimed misrepresentation exist does not preclude looking at the entire course of conduct undertaken by the insurer with respect to the circumstances surrounding the alleged misrepresentation or concealment in determining not whether the insurer can raise the issue, but rather, whether the alleged misrepresentation or concealment concerned a material matter. The test of materiality is subjective. The fact that an insurer was not legally required to cancel does not render irrelevant to the subjective test of materiality a decision not to cancel or investigate circumstances

43

1   that could in turn give rise to a right to cancel or rescind.

2       X. Bad Faith and Cancellation

3       ICW argues that it did not cancel the policy because of a

4   fear of being perceived as proceeding in bad faith.

5       Asserting that fraud with respect to one risk does not

6   necessarily affect the enforceability of the remaining insurance,

7   ICW cites (ICW post-trial Brief at 42) Coca Cola Bottling Co. v.

8   Columbia Casualty Ins. Co., 11 Cal.App.4th 1176, 1188 (1992), in

9   which it was held that fraud regarding coverage of products

10  liability was not material with respect to coverage of automobile

11  liability to which a claim related and which was a separately

12  rated subject of insurance. This does not appear to be pertinent

13  to ICW's asserted desire to avoid the appearance of proceeding in

14  bad faith.

15      The policy's California cancellation endorsement stated that

16  the grounds for cancellation were essentially those permitted by

17  statute (see preceding discussion). Improper or ineffective

18  attempts to cancel coverage may expose the insurer to liability

19  for breach of its implied covenant of good faith and cooperation

20  with the insured. However, a cancellation accomplished in

21  accordance with statutory and contractual requirements normally

22  will not breach the insurer's implied covenant. Williams v. State

23  Farm Fire & Cas. Co., 216 Cal.App.3d 1540, 1549 (1990). The cases

24  cited by ICW do stand for the proposition that a bad faith action

25  against an insurer will lie for wrongful or tortious

26  cancellation. See, McLaughlin v. National Union Fire Ins. Co., 23

27  Cal.App.4th 1132, 1157 (1994) (referring to a tortious or

28  wrongful attempt to cancel coverage when such action was

arbitrary); <u>Spindle v. Traveler's Ins. Companies</u>, 66 Cal.App.3d
951, 955-56 (1977) (involving an allegedly tortious cancellation
of medical malpractice insurance of one doctor for the improper
purpose of intimidating others covered by a master coverage
agreement to agree to higher premiums). However, there is no
basis for anticipating a charge of bad faith based upon a proper
cancellation effectuated upon grounds, and pursuant to policies,
acceptable under the contract and statute. An insurer who had
notice of the involvement of an unreported driver of allegedly
insufficient age, and who was involved in a serious accident and
reported by authorities to be at fault, within sixty days of the
effective date of the policy, had an opportunity to cancel the
policy.

Further, although there was testimony of Barbot that it
would have been vengeful and inappropriate to cancel for
nonpayment of the premium, it would appear that cancellation for
nonpayment was a perfectly valid reason for cancellation. The
concern of Schwarz that cancellation would have required a
discussion with ICW does not render cancellation for a valid
reason inappropriate; no authority is presented that demonstrates
that the fact of the accident eliminated an otherwise appropriate
option to cancel.

XI. <u>Duty to Investigate</u>

An automobile liability insurer must undertake a reasonable
investigation of the insured's insurability within a reasonable
period of time from the acceptance of the application and the
issuance of a policy. <u>Barrera v. State Farm Mutual Ins. Co.</u>, 71
Cal. 2d 659, 663 (1969). This duty directly inures to the benefit

of third persons injured by the insured; the third party, who has

obtained an unsatisfied judgment against the insured, may

properly proceed against the insurer; the insurer cannot then

successfully defend upon the ground of its own failure reasonably

to investigate the application. Id. at 663-64.

XII. Waiver and Estoppel

The insured has the burden of proof to establish the facts

necessary to demonstrate a waiver or estoppel. Waller v. Truck

Ins. Exchange, Inc., 11 Cal.4th 1, 31, 33-34 (1995).

Waiver is the intentional relinquishment of a known right

and exists where an insurer intentionally relinquishes its right

to rely on an exclusion; it depends on the intent of the insurer,

and it is not made out by evidence that an insurer merely failed

to specify the exclusion in a letter reserving rights. State Farm

Fire & Cas. Co. V. Jioras, 24 Cal.App.4th 1619, 1628 n. 7 (1994).

California courts will find waiver when a party

intentionally relinquishes a known right after knowledge of the

facts; the burden is on the party claiming a waiver to prove by

clear and convincing evidence that it does not leave the matter

to speculation. Waller v. Truck Ins. Exchange, Inc., 11 Cal. 4th

1, 31 (1995). A waiver will be found when a party's acts are so

inconsistent with an intent to enforce the right as to induce a

reasonable belief that such right has been relinquished. Waller,

11 Cal.4th at 33-34; Lunardi v. Great-West Life Assurance Co., 37

Cal.App.4th 807, 824 (1995). An insurer does not waive its right

to rescind a policy on the ground of false representations if it

was unaware of the falsity of those representations. Lunardi, 37

Cal.App.4th at 824. In order for there to be a waiver of the

46

right to rescind, there must be actual knowledge of a
misrepresentation. Maggini v. West Coast Life Ins. Co., 136
Cal.App. 472, 477-79 (1934) (knowledge of falsity regarding
health five years before the policy may have been a basis for
suspicion but did not amount to actual knowledge sufficient to
estop insurer from asserting fraud).

Waiver may be found where the insurer neglects to make
inquiries as to material facts where they are distinctly implied
in other facts of which information is communicated. Cal. Ins.
Code § 336.

It has been held that an insurer does not waive any right to
withdraw from a defense or dispute an obligation to indemnify
claims simply because the insurer agrees to defend the underlying
lawsuits and fails promptly to reserve rights. See, Ringler
Associates Inc. v. Maryland Casualty Co., 80 Cal.App.4th 1165,
1188-90 (2000) (no waiver found despite payment of defense costs
for over two years before reserving rights and then withdrawing
from the defense), and cases there cited. Denial of coverage on
one ground does not impliedly waive grounds not stated in a
denial absent clear and convincing evidence otherwise. Id.

The elements of an equitable estoppel are 1) the party to be
estopped must know the facts; 2) such party must intend that its
conduct will be acted on, or must so act that the party asserting
the estoppel had a right to believe that it was so intended; 3)
the party asserting the estoppel must be ignorant of the true
state of facts; and 4) the party asserting the estoppel must rely
on the conduct to his injury. Insurance Company of the West v.
Haralambos Beverage Company, 195 Cal.App.3d 1308, 1321 (1987).

47

Estoppel requires proof by the insured of detrimental reliance, Waller, 11 Cal.4th at 33-34, as well as proof of a reasonable belief that the insurer would provide coverage, State Farm Fire & Casualty Co. v. Jioras, 24 Cal.App.4th at 1627-28 ns. 7,8.

Failure to contest a reservation of rights by a declaratory relief action or other means evinces a lack of reliance. Ringler, 80 Cal.App.4th at 1190-91.

Failure to retain separate counsel by itself, and particularly the failure absent a showing that separate counsel might have obtained a more advantageous settlement, does not show detriment. State Farm Fire and Casualty Co. v. Jioras, 24 Cal.App.4th 1619, 1628-29 (1994). On the other hand, detrimental reliance would be indicated by placing counsel in a conflict of interest position in the preparation and pretrial conduct of the defense and depriving the party of separate counsel at the insurer's expense, or of an opportunity to request such counsel (pursuant to San Diego Federal Credit Union v. Cumis Ins. Society, Inc., 162 Cal.App.3d 358 (1984)) until trial was at hand and it would have been too late for an attorney representing solely the interests of the insured to have replaced the attorney who was representing the insurer's interests as well. Stonewall Ins. Co. v. City of Palos Verdes Estates, 46 Cal.App.4th 1810, 1838-39 (1996) (where three years passed after the reservation of rights without a declaratory relief action).

Cal. Civ. Code § 2860(b) provides in part:

For purposes of this section, a conflict of interest does not exist as to allegations or facts in the litigation for which the insurer denies coverage; however, when an insurer reserves its rights on a given issue and the outcome of that coverage issue can be controlled by

counsel first retained by the insurer for the defense
of the claim, a conflict of interest may exist....

A mere reservation of rights does not necessarily create a
conflict of interest that requires the appointment of independent
counsel; rather, it depends on the nature of the coverage issue
and its relationship to the issues in the underlying case.
Blanchard v. State Farm Fire and Casualty Co., 2 Cal.App.4th 345,
(1991) (where the insurer accepted defense of the insured
contractor in a construction defects action and reserved its
right to deny coverage for damages excluded by the policy
language (specifically, the (uncovered) cost of replacing faulty
workmanship, as distinct from (covered) costs of replacing
damaged property), it was held that it was appropriate for the
insurer not to have provided independent counsel because unlike
Cumis, in which the underlying suit against the insured contained
allegations in part that the conduct of the insured was
intentional and thus would not be covered, and in which the
attorney selected by the insurer would have to deal with clearly
divergent interests, in Blanchard the issue upon which coverage
turned was independent of the issues in the underlying case). A
conflict of interest does not arise unless the outcome of the
coverage issue can be controlled by counsel first retained by the
insurer for the defense of the underlying claim. Id.

The conflict must be actual and significant, not merely
potential and theoretical; no right to cumis counsel arises where
the issue is independent of and extrinsic to the issues in the
underlying action such that the retained attorney was not in fact
subject to conflicting interests and had no actual incentive to

1   attach liability to the insured. <u>Gulf Ins. Co. v. Berger, Kahn,</u>

2   <u>Shafton, Moss, Figler, Simon & Gladstone</u>, 79 Cal.App.4th 114, 130

3   (2000) (where the theory of liability was not such that liability

4   could have been transferred from covered claims to uncovered

5   claims).

6        Here, the issue of misrepresentation by G&P regarding who

7   was a driver has not been shown to be an issue in the underlying

8   tort actions which ICW defended. In the underlying actions, it

9   was to the advantage both of G&P and ICW to minimize the

10  liability of G&P; there is no showing that the defense attorney

11  could have controlled the outcome of the coverage issue to the

12  detriment of the insured.

13       The question of the existence of a conflict is a question of

14  law unless there is a dispute over an underlying fact. <u>Blanchard</u>,

15  2 Cal.App.4th at 350-51.

16                       <u>FINDINGS OF FACT</u>

17       I. <u>Introduction</u>

18       After hearing the proofs of the parties, considering the

19  testimony of all witnesses, the exhibits received into evidence,

20  the statements and arguments of counsel, the stipulations of the

21  parties, and all the submissions concerning proposed findings of

22  fact and conclusions of law submitted by the parties, the Court

23  enters the following findings of fact and conclusions of law. In

24  making a finding of fact, the Court intends to rely on all

25  evidence in the record that is consistent with or supports the

26  Court's finding. If the Court has mistakenly categorized a

27  finding as factual or legal, the Court intends the substance of

28  the finding to predominate. To the extent that any finding of

fact may be interpreted or construed as a conclusion of law, or any conclusion of law may be interpreted or construed as a finding of fact, it is the Court's intention that such construction or interpretation be adopted.

## II. Jurisdiction

It is undisputed that the citizenship of the parties is diverse and that the amount in controversy exceeds $75,000.00, exclusive of interest. The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

Further, the parties have presented an actual and justiciable controversy regarding the respective rights and responsibilities of Clarendon and ICW under policies of insurance issued by the parties. Granting declaratory relief would serve the useful purposes of clarifying both the legal relations of the parties and the nature and extent of any the controversy remaining before the Court. The Court exercises its discretion to determine the parties' claims for declaratory relief and thereby to declare the rights of the parties.

## III. Facts

### A. Undisputed Facts

The parties stipulated in the joint pretrial statement/order of May 14, 2004, that all facts set forth in the Court's June 30, 2000, order under the heading "I. FACTS," sections A through D, are deemed admitted and/or are the law of the case except to the extent listed in sections III and IV of the order of May 14,

2004."[7] The parties further agreed in the order of May 14 that specific facts were uncontested. Thus, the undisputed facts are as follows:

1. Insurance Company of the West (ICW) is a California corporation with its national headquarters in San Diego, California.

2. On or about January 13, 1998, G&P Transport (G&P) was a motor carrier and the owner of a 1997 Kenworth tractor, VIN 1XKADB9XIVR741771 (the tractor), and a refrigerated trailer unit (the trailer).

3. On or about January 13, 1998, there was a written lease agreement between G&P and H&G Transport (H&G) for the use of the tractor.

4. On or about January 13, 1998, while being operated by Inderjit Singh, the 1997 Kenworth tractor, with a refrigerated trailer in tow, was involved in a vehicular accident involving a 1994 International tractor being operated by Craig McAlexander, a 1996 blue Chevrolet Cavalier (the Cavalier) being operated by Richard Moore and occupied by passenger Mary Ellen Moore, and a 1975 tan Chevrolet being operated by William Hatley near Shawnee in Pottawatomie County, Oklahoma (the accident). At the time of

---

[7] The Court notes that this stipulation is unclear because sections III and IV of the May 14, 2004 pretrial statement, which was later adopted as the order governing the trial, were "UNDISPUTED FACTS" and "DISPUTED FACTUAL ISSUES," respectively. Section V of the May 2004 order was "DISPUTED EVIDENTIARY ISSUES." Clearly the parties did not intend that undisputed facts from Judge Coyle's order be rendered disputed simply because they were later referred to as undisputed facts in the pretrial order. Thus, the Court concludes that the designation of sections III and IV as exceptions was erroneous; the parties must have intended to designate sections IV and V instead of III and IV. The Court thus interprets the stipulation in the May 2004 order as agreeing that the facts in Judge Coyle's order of June 30, 2000, were undisputed except to the extent listed in section IV and V of the May 2004 order.

1   the accident, Inderjit Singh was twenty-two years old, and the

2   tractor was displaying placards listing the federal operating

3   authority of H&G, with the permission of H&G and pursuant to a

4   written lease agreement between H&G and G&P. G&P was hauling

5   cargo for H&G transport under H&G's federal operating authority

6   (ICC permit) because G&P did not have its own authority. Richard

7   Moore suffered fatal injuries as a result of the accident. Mary

8   Ellen Moore was a passenger in the Cavalier. It is alleged that

9   Mary Ellen Moore, Craig McAlexander, and William Hatley sustained

10  injuries as a result of the accident.

11       5. On or about May 4, 1998, an action was filed by Mary

12  Ellen Moore styled <u>Mary Ellen Moore Individually and Mary Ellen</u>

13  <u>Moore as Administratrix of Richard Harris Moore, deceased v. H&G</u>

14  <u>Transport Inc. and G&P Transport, Inc.</u>, case number CV-98-233, in

15  the District Court of Pottawatomie County, Oklahoma (the <u>Moore</u>

16  action). On our about March 18, 1999, Craig McAlexander filed a

17  complaint in intervention, naming as defendants H&G, G&P, ICW,

18  and Clarendon. Subsequently, Moore joined ICW and Clarendon as

19  party defendants. The action settled pursuant to a written

20  settlement (the Moore settlement agreement) entered into by both

21  Clarendon and ICW. ICW paid a total of $510,000.00 towards the

22  settlement, and Clarendon paid a total of $540,000.00 towards the

23  settlement. Further, ICW paid $33,320.26 in fees and costs in

24  defending the <u>Moore</u> action. ICW has refused to reimburse

25  Clarendon's costs and expenses incurred in defending H&G in the

26  <u>Moore</u> action and has refused to reimburse the payments made by

27  Clarendon to settle the <u>Moore</u> action.

28       6. On or about June 2, 1998, an action was filed by Mr.

1  Wiliam Hatley styled <u>William Hatley Individually and dba A-Hote</u>

2  <u>Wrecker Service v. Inderjit Singh, Parampreet Singh, H&G</u>

3  <u>Transport Inc., G&P Transport and ICW</u>, case number CV-98-289, in

4  the District Court of Pottawatomie County, Oklahoma (the Hatley

5  action). The action settled, with ICW paying a total of

6  $21,750.00 towards the settlement and $7,277.50 for environmental

7  clean-up fees in connection with the accident.

8      7. On or about January 6, 1998, Parampreet Pannu submitted

9  an application for insurance on behalf of G&P (the application).

10      8. Rosemary Mirko, an owner of RAM Commercial Insurance

11  Services (RAM), a retail insurance brokerage, signed and helped

12  prepare the application. It is the usual practice of Ms. Mirko to

13  ask the applicant who would be driving the vehicles. Mirko would

14  then run a motor vehicle report (MVR) for all disclosed drivers.

15  On January 6, 1998, Mirko sent the application by facsimile and

16  mail to Kleiner, Fields & Burton (KFB), a wholesale insurance

17  agency that acted as the middleman between retail agents and ICW.

18  After receiving G&P's application, KFB forwarded it to ICW.

19      9. Inderjit Singh is not listed as a driver for G&P on the

20  application. The section of the application entitled "Driver's

21  Schedule" lists only Parampreet Pannu (Pannu) as the driver of

22  the listed 1997 Kenworth. At the time of the application,

23  Inderjit Singh was twenty-two years old.

24      10. Under ICW's underwriting guidelines, the minimum age for

25  a driver was twenty-three, and age twenty-five or older was

26  preferred; drivers were required to have a minimum of two years

27  of experience in commercial over-the-road driving. ICW's

28  underwriting guidelines required that drivers' MVR's be "received

and approved before qualifying to drive." This meant that the retail agent was to send any disclosed drivers' MVR's to KFB for approval.

11. ICW issued liability policy number XHO1557531-00 to G&P with effective dates of January 6, 1998, through January 6, 1999 (the ICW policy or the policy). The tractor was a specifically described auto on the ICW policy. The policy was issued under ICW's small fleet trucking program.

12. Both the ICW and the Clarendon policies were issued and delivered in California and contain several endorsements which conform the policies to California law. Both of the scheduled vehicles on the ICW policy were described as being principally garaged in Turlock, California. The VIN number for the first scheduled auto on the ICW policy matches that of the truck involved in the accident.

13. ICW did not cancel the policy or issue a named driver exclusion after learning that Inderjit Singh was a driver for G&P. ICW continued to insure G&P until the ICW policy expired by its own terms.

14. On or about October 9, 1997, Clarendon issued to H&G insurance policy number T07-702350 (the Clarendon policy), a commercial automobile liability insurance policy which was in full force and effect on the day of the accident. The Clarendon policy contained an "Endorsement for Motor Carrier Policies of Insurance For Public Liability Under Sections 29 and 30 of the Motor Carrier Act of 1980" (MCS-90 endorsement), which was in effect at the time of the accident.

///

55

B. Disputed Facts

1. Coverage under the ICW policy was $750,000.00 per accident. The policy provided:

CONCEALMENT, MISREPRESENTATION OR FRAUD

_____This Coverage Form is void in any case of fraud by
       you at any time as it relates to this Coverage Form. It
       is also void if you or any other "insured," at any time,
       intentionally conceal or misrepresent a material fact
       concerning:

a. This Coverage Form;
b. The covered "auto";
c. Your interest in the covered "auto", or
d. A claim under this Coverage Form.

2. The ICW policy was underwritten as part of the small fleet trucking program, the underwriting guidelines of which were developed by ICW and KFB and provided that there be included on the schedule of drivers on the application all drivers who would be operating the equipment, including owners and part-time drivers; drivers' minimum age was twenty-three years; applicants or insureds must require as a minimum in their hiring practices two years of commercial over-the-road driving experience; and any motor vehicle record (MVR) of the drivers be received, be acceptable, and be approved before qualifying to drive.

3. The guidelines set a motor vehicle report (MVR) point system whereby violations of law, accidents, and failures to appear were assigned point values; four points required a driver exclusion, and three probation, which might prompt an exclusion for further violations. Nevertheless, the limits were negotiated in various circumstances; occasionally ICW permitted coverage of drivers who were otherwise unacceptable and charged a higher premium or imposed other conditions; sometimes a policy was

issued to an insured who employed an unacceptable driver, and the driver would be specifically excluded.

4. The purpose of the age requirement was to obtain mature drivers, and the purpose of the experience requirement was risk control.

5. The evidence established by a preponderance that the ICW underwriting guidelines were not inflexible, were not invariably or carefully observed or followed in the underwriting process, were not attended to in connection with the claims process, and were also subject to negotiation; the evidence established by a preponderance that ICW and KFB were sloppy and lax in their business practices.

6. Rosemary Mirko acted on behalf of RAM, which in turn acted as G&P's broker and agent but not as the agent of the insurer.

7. RAM did not have the authority to bind coverage on behalf of ICW.

8. KFB generally acted as ICW's broker and managing general agent; KFB was also a broker or general agent for Clarendon and had underwritten H&G's Clarendon transportation policy.

9. KFB had the authority to issue ICW policies and bind coverage, subject to being overruled by ICW if ICW determined to reject bound coverage as not within the guidelines.

10. The evidence establishes by a preponderance that Mirko spoke with Gurdial Singh Gill (Gill), whom Mirko knew through business that RAM had done with H&G Trucking, a company to whom Gill had leased a truck. However, the evidence does not establish the time, place, or manner of the conversation; the precise

57

questions uttered by Mirko; or the responses thereto.

11. In completing the application process, Mirko used to some extent a standard form provided by KFB that was written in English and that was not translated into Punjabi, the principal language spoken by Gill and Pannu. No interpreter assisted during the application process for the ICW policy.

12. Mirko was the only direct participant in the process of taking the application from G&P who testified in person at trial; testimony given by deposition was limited to short excerpts; thus, the evidence provided a limited context for the drawing of inferences regarding the application process.

13. The evidence did not establish by a preponderance that either Gill or Pannu understood, spoke, or read English; the evidence did not establish that either of them could understand Mirko, understand the policy or application therefor, or communicate reliably or clearly with Mirko respect to the matters included in the application for the policy.

14. The limited testimony presented to the Court, even when considered in light of the other evidence, did not establish that Mirko did, or was able to, communicate the matters on the application to Gill or Pannu clearly or accurately for them to understand the substance of what was being communicated to them or recorded on the application form.

15. The application form did not specifically request the listing of independent contractors, subcontractors, driver's helpers, trainees, co-drivers, or all drivers. However, it asked whether the applicant used subhaulers or owner-operators, and it had a schedule for the listing of multiple drivers that had

columns for the date of birth, driver's license information, and full- or part-time status of each driver. It directed completion of the equipment and drivers' list forms.

16. The application form did not specifically state that the applicant had to list the driver's commercial driving experience or require the identification of all principal owners; it did ask if the applicant agreed promptly to report all driver and vehicle changes to the agent; it also had a driver's schedule with space to list drivers, and the only driver listed was Pannu.

17. The evidence did not establish by a preponderance that Mirko asked for all the drivers of the vehicles, the age or years of experience of all the drivers or of every driver, or for a report of any or all changes in drivers or vehicles.

18. The evidence did not establish by a preponderance that Mirko, or anyone acting on behalf of RAM, KFB, or ICW, informed or instructed any applicant of a duty promptly to report all driver changes or all vehicle changes.

19. The Court rejects Mirko's testimony that she simply read the questions on the form and received answers. The evidence did not establish by a preponderance that Mirko had a clear memory of the details of the application process, including the precise questions asked, the precise answers given, who gave her what information, or whether the conversations regarding the application proceeded in person or over the telephone.

20. The Court finds not worthy of belief Mirko's position that communication with Gill and/or Pannu was not difficult and that speaking slowly and spelling words was sufficient to effectuate communication.

21. The evidence did not establish that Mirko understood or believed that the guidelines or requirements regarding age and experience for drivers were important or material; the evidence did not establish that Mirko knew or understood at the time she participated in filling out the application that there was any driver of G&P who was not disclosed on the application.

22. At all pertinent times, H&G was a corporation engaged in the commercial transportation of property in interstate and intrastate commerce.

23. The evidence does not establish by a preponderance the precise time of the formation of G&P as a business entity. The application listed the form of the entity as a partnership, and it was signed by Pannu.

24. Mirko understood that the policy was being obtained for a business that would be called G&P, the partners of which would be Gill and Pannu.

25. Gill told Mirko that he would not be driving because of kidney problems. The underwriting guidelines provided that if a principal owner of a prospective insured did not meet the guidelines, the account should be declined. Although pursuant to the underwriting guidelines and customary underwriting practices, it was necessary to obtain MVR's for all owners or partners, no effort was made to ascertain the MVR of Gill.

26. The application form was not part of the policy, incorporated therein, or attached to the policy sent to the insured, but it asked the applicant if he agreed to report all driver and vehicle changes to the agent. Although Mirko testified that standard form correspondence sent out to the insured from

1  RAM with the policy reminded the insured to report all drivers,

2  the evidence did not establish by a preponderance that

3  correspondence with such an admonition was sent to G&P.

4      27. On or about January 8, 1998, the application was

5  submitted to KFB with an MVR of Pannu, which reflected his birth

6  date of April 6, 1974, which made him twenty-three years old; the

7  MVR did not indicate Pannu's experience, and it reflected

8  issuance of a license on December 9, 1997. When questioned by

9  Martha Escobar of KFB, Mirko informed Escobar that for four to

10  five years, Pannu had been driving for H&G.

11     28. The evidence did not establish by a preponderance that

12  ICW knew, or should have known, that Pannu did not meet any ICW

13  underwriting guidelines at the time that coverage was bound for

14  G&P.

15     29. The customary practice of KFB and ICW was for KFB to

16  forward a copy of an application for insurance to ICW for review,

17  but it was not uncommon for ICW to receive copies of an

18  application several days after coverage had already been bound by

19  KFB.

20     30. On or before January 8, 1998, the application was

21  reviewed by Sherry Barbot and/or Karen Klase of ICW's

22  underwriting department.

23     31. On or before January 8, 1998, Karen Klase confirmed that

24  coverage for G&P was bound pursuant to ICW policy No. XHO

25  1557531-00, with effective dates of January 6, 1998, through

26  January 6, 1999 (the ICW policy).

27     32. The declarations section of the ICW policy provides in

28  relevant part as follows:

```
ITEM TWO-SCHEDULE OF COVERAGES AND COVERED AUTOS
This policy provides only those coverages where a charge
is shown in the premium column below. Each of these
coverages will apply only to those "autos" shown as covered
"autos." "Autos" are shown as covered "autos" for a
particular coverage by the entry of one or more of the
symbols from the "COVERED AUTOS" Section of the Truckers
Coverage From next to thename of the coverage.
```

Under Item Two of the declarations of the ICW policy, the

symbol "46" is indicated next to "Liability," under the heading

captioned "Covered Autos."

Section I of the policy provides in relevant part:

```
SECTION I-COVERED AUTOS

ITEM TWO of the Declarations shows the "autos" that are
covered "autos" for each of your coverages. The following
numerical symbols describe the "autos" that may be covered
"autos". The symbols entered next to a coverage on the
Declarations designate the only "autos" that are covered
"autos."

A. DESCRIPTION OF COVERED AUTO DESIGNATION SYMBOLS
   SYMBOL DESCRIPTION
                        * * *
   46 = SPECIFICALLY DESCRIBED "AUTOS".

   Only those "autos" described in ITEM THREE of the
   Declarations for which a premium charge is shown
   (and for Liability Coverage any "trailers" you don't own
   while attached to any power unit described in
   ITEM THREE).
```

Item Three of the declaration page of the ICW policy refers

to Schedule I-97, which lists the following vehicles:

```
97KENWORTH#1xkadb9x1vr741771
00 UNID #U01
```

The tractor was a specifically described auto in the ICW

policy.

The ICW policy provides in relevant part:

```
SECTION V TRUCKERS CONDITIONS
B. GENERAL CONDITIONS
   *        *        *
   2. CONCEALMENT
```

> This Coverage Form is void in any case of fraud
> by you at any time as it relates to this Coverage
> Form. It is also void if you or any other "insured"
> at any time intentionally conceal or misrepresent
> a material fact concerning:
>
> a. This Coverage Form;
> b. The covered "auto";
> c. Your interest in the covered "auto"; or
> d. A claim under this Coverage Form.

32. The evidence did not establish by a preponderance that Inderjit Singh was employed by, or was a driver for, G&P at the time of the application for the insurance policy; the evidence did not establish by a preponderance that Gill, Pannu, or G&P understood, believed, or knew that Inderjit was an employee of G&P before the time of the application for insurance.

33. The evidence established that Inderjit Singh was driving for G&P at the time of the accident.

34. The evidence did not establish by a preponderance that Gill or Pannu knew or understood that they had been asked to disclose all drivers, including Inderjit.

35. The evidence did not establish by a preponderance that Gill or Pannu knew or understood when submitting the application, or at any time during the application process, that they were omitting desired information regarding drivers or Inderjit.

36. The evidence did not establish by a preponderance that Gill or Pannu knew or understood at any time during the application process, when submitting the application, or at any time thereafter, that they made an untrue statement regarding drivers or Inderjit.

37. The evidence did not establish by a preponderance that Mirko knew or understood that information regarding drivers was

omitted from the application.

38. The evidence did not establish by a preponderance that there was any knowing or intentional concealment or failure by G&P, Gill, or Pannu to disclose any fact concerning the identity of drivers during the application process or thereafter.

39. The evidence did not establish by a preponderance that there was any knowing or intentional concealment or failure by G&P, Gill, or Pannu to disclose any fact concerning the age of any driver during the application process or thereafter.

40. The evidence did not establish by a preponderance that there was any knowing or intentional concealment or failure by G&P, Gill, or Pannu to disclose any fact concerning the experience of any driver during the application process or thereafter.

41. The evidence did not establish by a preponderance that Gill, Pannu, or G&P concealed or failed to disclose any fact regarding any driver with the intent to induce reliance by ICW.

42. The evidence did not establish by a preponderance that Gill, Pannu, or G&P concealed or failed to disclose any fact regarding any driver for the purpose of obtaining insurance or for inducing ICW to write the policy.

43. The evidence did not reveal sufficient circumstances surrounding the coverage of H&G by Clarendon to provide a context for the drawing of inferences by the Court; the evidence did not establish by a preponderance that any failure to disclose drivers in connection with Clarendon's coverage of H&G was intentional.

44. The evidence established by a preponderance that on or about January 22, 1998, ICW was aware of the accident and that

Inderjit Singh had driven for G&P and had been involved in the accident even though he was not listed on the ICW policy. The Court credits the evidence to this effect and discredits testimony and evidence that would support a contrary conclusion.

45. The Court credits the testimony of Ronald Schwarz, President of KFB, to the effect within a few days of the accident, Sherry Barbot, ICW's underwriting manager, contacted Schwarz of KFB to complain that Inderjit Singh, the driver during the accident, was not disclosed as a driver on the application.

46. The Court credits the testimony of Rosemary Mirko and related documentation that Mirko sent Inderjit's MVR to KFB on January 28, 1998.

47. At all pertinent times, Karen Kirk was the senior claims representative of ICW assigned to the loss from the accident on January 13, 1998. Her duties involved determining whether coverage for an accident was excluded, including determining whether the driver was listed in a named driver exclusion and identifying whether any potential policy exclusions might be applicable. Kirk nevertheless was unaware of ICW's underwriting guidelines until after the inception of this litigation. Her duties included forwarding claims abstracts to the underwriting manager, Sherry Barbot, who would then review any changes in risks for the underwriting department.

48. ICW claimed that it would issue a named driver exclusion for any driver it considered unacceptable, regardless of whether or not that driver was still employed by the insured; however, ICW did not issue a named driver exclusion for Inderjit Singh.

49. On or about January 23, 1998, Kirk telephoned Inderjit

65

Singh (Inderjit). In the conversation on January 23, 1998, Kirk did not ask Inderjit when he began driving trucks for G&P or any other questions regarding his commercial or over-the-road experience.

50. Although ICW and its agents believed after the accident that at the time of the accident Inderjit was driving for G&P, and although the employment status of Inderjit at the time of the application was unknown to ICW or its agents, no inquiry regarding or investigation of Inderjit's employment status as of the time of the application was undertaken by ICW or its agents after the accident.

51. Although Kirk claimed that she was told by Inderjit that he had been terminated by G&P and was no longer employed, her notes do not reflect any discussion of Inderjit's employment status with Inderjit or anyone else.

52. It was Kirk's custom to keep a running computerized log identifying ICW's activities in handling a claim and noting any facts or issues pertaining to coverage; however, none of the notes provided by ICW refer to Inderjit's employment status; further, none of Kirk's pre-litigation computerized log notes provided by ICW identify Inderjit Singh's status as an undisclosed driver to be a potential coverage issue.

53. On or about March 10, 1998, Kirk again spoke with Inderjit, but the conversation did not include mention of Inderjit's employment status, history of driving with G&P, or his driving experience.

54. The Court rejects the evidence tending to show that Kirk learned in her conversations with Inderjit or from other sources

1 | that he was no longer driving for G&P.

2 | 55. The testimony of Karen Kirk was inconsistent, vague, and
3 | lacked specifics. The evidence did not establish by a
4 | preponderance that by March 10, 1998, or in March 1998, Kirk or
5 | anyone else had informed Sherry Barbot, underwriting manager of
6 | ICW, that Inderjit was no longer working for G&P.

7 | 56. Because the accident involved a significant loss, Karen
8 | Kirk was required to submit quarterly reports that would discuss
9 | coverage issues. None of the quarterly reports on the accident
10 | and loss occasioned thereby prepared by ICW ever discussed
11 | Inderjit's employment status or his qualifications under ICW's
12 | underwriting guidelines, identified misrepresentation as a
13 | potential ground for disclaiming coverage, or suggested that
14 | G&P's failure to disclose Inderjit Singh on the application might
15 | serve as a basis for disclaiming coverage.

16 | 57. ICW's investigation of the accident included retention
17 | of GAB Robins, who interviewed Inderjit and provided ICW with a
18 | written report dated January 27, 1998, which reflected Inderjit's
19 | date of birth as August 13, 1975, and which did not reflect any
20 | discussion of Inderjit's employment status or history of driving
21 | with G&P; it indicated that he had a Class A license since August
22 | 1997 and also that he had been a commercial truck driver since
23 | 8/77 (apparently an error). ICW did not attempt after the
24 | accident to learn the employment status of Inderjit at the time
25 | of the insurance application.

26 | 58. The Court credits Klase's testimony that she and Barbot
27 | discussed cancelling the policy because Inderjit was not on the
28 | application and was an unacceptable risk. The Court also credits

Klase's testimony that during the term of the policy, she and Barbot discussed not renewing the policy, instead of canceling it, because of the named insured problem.

59. The credible evidence does not establish that any discussion at ICW of Inderjit's no longer driving for G&P occurred before October 1998.

60. As of January 23, 1998, no one was driving for G&P under the ICW policy because the only covered vehicle was totaled in the accident.

61. The evidence established by a preponderance that after the accident, ICW was not happy about having written or writing the risk. Barbot wanted to cancel the policy after learning of the unreported driver and the loss. She offered as an explanation for not cancelling that it was too late (beyond sixty days after policy inception), it would have looked vengeful, and it might have precipitated an investigation by the insurance authorities. However, ICW had had notice of the loss and the unreported driver during the sixty days following inception of the policy; ICW knew it could have cancelled the policy for any reason within the first sixty days. ICW had two opportunities to cancel the policy (upon the requests of the insured and the finance company) and nevertheless did not cancel the policy.

62. Although ICW's normal procedure upon learning that an unscheduled driver who did not meet guidelines was involved in an accident was to insist on a named driver exclusion or cancellation, ICW neither cancelled the policy nor sought a named driver exclusion. It was the customary practice of KFB and ICW to make a decision with respect to renewal of a policy within five

business days or a week of learning of an unacceptable risk.

63. The Common Policy Conditions portion of the policy provided that ICW could cancel the policy by mailing or delivering to the insured written notice of the cancellation at least ten days before the effective date of cancellation if it canceled for nonpayment of premium, or thirty days before the effective date of cancellation if it canceled for any other reason; the notice of cancellation would state the effective date of cancellation, and the policy period would end on that date.

64. The California Changes--Cancellation and Nonrenewal endorsement to the policy provided that as to policies in effect for more than sixty days, the insurer might cancel the policy only upon the occurrence of enumerated occurrences, including nonpayment of premium and discovery of any violations of state laws or regulations establishing safety standards by the insured or its representative which materially increased any of the risks insured against.

65. G&P requested that ICW cancel the policy on or about February 4, 1998, and again on March 5, 1998.

66. On or about February 4, 1998, pursuant to the G&P's request and a loss policy release prepared by Rosemary Mirko of RAM dated January 21, 1998, RAM directed KFB to cancel the ICW policy because the only covered vehicle was totaled in the accident.

67. ICW and its agents understood that they were legally entitled to, and could have, cancelled the policy at that time and would have had no obligation to reinstate the policy, even if the insured subsequently requested it. However, the policy was

69

1   not cancelled.

2       68. On March 4, 1998, Mirko and Shannon Gwinn of RAM

3   directed KFB to process the cancellation because the insured had

4   not notified them of having purchased another vehicle.

5       69. Imperial Premium Finance, Inc., the company that was

6   financing G&P's payment of the premium on the ICW policy, sent to

7   RAM a notice of intention to cancel dated February 17, 1998, with

8   an effective date of cancellation of March 5, 1998, because of a

9   delinquency in payment.

10      70. ICW and its agents understood that they were legally

11  entitled to, and could have, initiated cancellation procedures at

12  that time and would have had no obligation to reinstate the

13  policy, even if the insured subsequently requested it; they could

14  have ignored the request for reinstatement and proceeded to

15  cancel the policy.

16      71. On or about March 5, 1998, the finance company again

17  instructed ICW to cancel the ICW policy for nonpayment.

18      72. ICW and its agents understood that once they received a

19  request to cancel a policy from a premium finance company, they

20  were not obligated to reinstate the policy, even if the finance

21  company subsequently requested that they do so.

22      73. On March 5, 1998, Shannon Gwinn of RAM faxed a memo to

23  Martha Escobar of KFB directing KFB to discard the previous day's

24  memo because the insured had purchased another vehicle. Escobar

25  replied that notice of cancellation for nonpayment of the premium

26  had issued from the finance company, and she asked for

27  clarification of whether or not she should add the vehicle.

28      74. An endorsement to the ICW policy effective March 5,

1  1998, added a 1998 Volvo and a 1998 utility to the policy.

2  75. KFB prepared a notice of cancellation, dated March 10,

3  1998, which was to be effective March 28, 1998.

4  76. On or about March 11, 1998, RAM replied to the inquiry

5  of Escobar of KFB, informing her that the insured had just paid

6  and that reinstatement would follow and be processed as soon as

7  possible.

8  77. On March 12, 1998, RAM was informed by a facsimile

9  transmission from the finance company that the delinquent payment

10  was received on March 12, 1998, and the company requested

11  reinstatement. A formal notice of request to insured for

12  reinstatement was sent out to RAM by the finance company on March

13  13, 1998.

14  78. The cancellation that had been directed was not

15  effected. ICW chose to honor the premium finance company's

16  request for reinstatement even though it understood that it was

17  not obligated to do so.

18  79. A request for cancellation by the insured or the premium

19  finance company would permit cancellation of the policy, even

20  over any subsequent objection by either the insured or the

21  premium finance company.

22  80. Any fear on the part of KFB or ICW personnel or agents

23  that they would be perceived to be acting in bad faith if they

24  cancelled the contract was without objective basis.

25  81. The Court finds that neither KFB nor ICW personnel or

26  agents had a genuine or sincere, subjective fear of appearing to

27  have acted in bad faith by cancelling the policy after the

28  accident.

71

82. Documentation of any California operating authority or PUC endorsement for G&P with respect to the ICW policy was lacking. The evidence established by a preponderance that the insured was not entitled to thirty days' notice of cancellation.

83. The evidence did not establish by a preponderance the driving experience of Inderjit.

84. To cancel a policy because of an underage driver or noncompliance with underwriting rules would normally have required a discussion between KFB and the carrier as to whether the policy should be canceled.

85. Although there was limited testimony to the effect that the ICW policy would not have issued had Pannu and Inderjit been the drivers, neither this testimony nor the other evidence, including but not limited to guidelines, practices, and conduct of the insurance entities and representatives involved, established by a preponderance that the policy would not have issued had Inderjit been disclosed as a driver, or that the policy would not have issued had Inderjit's age and experience been disclosed.

86. After G&P requested to add a 1998 Volvo tractor to the ICW policy on or about March 5, 1998, KFB retained inspectors, in this instance MLK, to go to the facility of G&P and to report, inter alia, anything contrary to the application. The report of MLK revealed that the only person to drive the 1998 Volvo tractor would be Gurdial Gill.

87. Gill had represented that he would not be driving. As an owner, however, he could potentially drive the truck. ICW requested an MVR for Gill. Gill's MVR reflected several moving

violations and was not adequate to meet the underwriting guidelines.

88. The evidence did not establish by a preponderance that on April 22, 1998, Gill misrepresented to MLK Inspections his status as the only driver.

89. ICW did not issue a named driver exclusion for Gill or require him to sign any warranty that he would not drive for G&P; further, it proceeded to continue the coverage in effect under those circumstances.

90. On or about June 11, 1998, the ICW policy was amended to add a 1996 Kenworth Tractor.

91. On or about July 8, 1998, ICW asked KFB to identify the persons who would be driving the 1996 Kenworth; KFB requested RAM to identify the drivers, and on or about July 11, 1998, RAM faxed the MVR of Tarlok Singh to KFB.

92. The evidence did not establish by a preponderance that an MVR of Inderjit was faxed to KFB at that time. The evidence did not establish by a preponderance that KFB advised ICW in July 1998 that Inderjit Singh would be driving the 1996 Kenworth. The evidence did not establish by a preponderance that Inderjit Singh was sought to be added as a driver to a policy in the summer of 1998.

93. Between June 11, 1998, and early July 1998, neither ICW nor KFB was advised of the identity of the driver(s) for the 1996 Kenworth.

94. Neither ICW nor any person or entity on its behalf issued a named driver exclusion with respect to Inderjit Singh.

95. At some time during the term of the policy, the file was

marked by ICW for nonrenewal. In October 1998, Barbot decided not to renew G&P's policy because of an owner with a poor MVR.

96. The evidence did not establish by a preponderance that an applicant's use of Inderjit as a driver would have affected ICW's decision to enter into the contract.

97. The evidence did not establish by a preponderance that an applicant's use of Inderjit as a driver would have affected ICW's decision to enter into the contract at a particular premium rate.

98. On behalf of ICW, Kirk requested contribution from Clarendon towards a settlement of approximately $21,000.00 paid by ICW. Clarendon refused to share in the settlement.

99. The settlement agreement regarding the <u>Moore</u> action specifically provided:

> Both [ICW] and Clarendon National Insurance Co.
> make such payment with full reservation of rights
> against one another. Both insurers, [ICW and Clarendon],
> specifically reserve the right to argue that they
> are entitled to reimbursement for some or all of
> the monies paid respectively to the Plaintiffs.
> No insurer shall be treated as a "voluntary payor."
> Each insurer has denied that it provides any coverage.
> The execution of this agreement is not an admission of
> coverage.

100. Between January 21, 1998, and January 28, 2000, ICW did not disclaim coverage or reserve its rights to disclaim coverage based on the fact that Inderjit Singh was operating the truck.

101. In a letter from ICW to Clarendon dated November 10, 1998, ICW argued that Clarendon provided primary coverage by virtue of its MCS-90 endorsement; ICW did not indicate that ICW contemplated declining the Hatley claim based on a material misrepresentation by G&P.

102. After Judge Coyle's June 30, 2000 order, ICW alleged for the first time that the reason it did not decline coverage or cancel the ICW policy upon learning about Inderjit Singh was because Inderjit told Kirk that he was no longer employed by G&P.

103. In support of ICW's motion for new trial, Kirk submitted a declaration dated July 13, 2000, wherein she stated that the issue of her conversation about Inderjit Singh's employment status did not come up in her deposition of January 12, 2000, and did not come up until a conversation she had with Mr. Wagoner on July 10, 2000.

104. ICW's underwriting file does not contain any notations of a conversation involving anyone at ICW regarding the coverage implications of Inderjit Singh's driving.

105. The only reservation of rights letter issued by ICW was issued on January 28, 2000, approximately two weeks after Karen Kirk's January 12, 2000, deposition.

106. The reservation of rights letter issued approximately two years after ICW was notified of the accident, one year and seven months after the filing of the Hatley action, and one year and eight months after the filing of the Moore action.

107. By letter dated February 14, 2000, Gill responded to the reservation of rights letter.

108. The reservation of rights letter was the first document generated by ICW (apart from those generated by counsel in this litigation) in which ICW indicated that Inderjit's status as the driver created any coverage issues.

109. The evidence established by a preponderance that it was not uncommon for insured trucking concerns to have changes or

1  additions in drivers during the life of a policy.

2     110. The evidence did not establish by a preponderance when
3  ICW learned of facts concerning Inderjit's having driven with or
4  for Gill before the accident.

5     111. In failing to rescind earlier or to issue an earlier
6  reservation of rights, or in participating in the <u>Moore</u> and
7  <u>Hatley</u> actions in any respect, neither ICW nor any of its agents
8  intended to forego a coverage defense based on  concealment or
9  misrepresentation by G&P regarding Inderjit being a driver or
10 regarding Inderjit's age or driving experience.

11    112. Neither ICW nor any of its agents intended that G&P or
12 Clarendon rely on its failure to rescind, or its participation
13 in, or payments made regarding, the <u>Moore</u> action and/or the
14 <u>Hatley</u> action, as a binding representation of coverage.

15    113. ICW did not waive its coverage defense.

16    114. Clarendon defended H&G in the <u>Moore</u> and <u>Hatley</u> actions
17 despite its conclusion that it had no duty to defend subject to a
18 reservation of rights.

19    115. ICW settled the <u>Hatley</u> action on November 17, 1998, for
20 $21,750.00, and on April 7, 1998, paid $7,277.50 in settlement of
21 an environmental cleanup claim.

22    116. On February 28, 2000, Clarendon and ICW settled the
23 <u>Moore</u> action (including the McAlexander and Arkansas Workers'
24 Compensation Commission petitions in intervention) for
25 $1,050,000.00; ICW paid $510,000.00, and Clarendon paid
26 $540,000.00.

27    117. G&P did not retain independent counsel in the <u>Moore</u> and
28 <u>Hatley</u> actions.

118. The evidence did not establish by a preponderance that G&P was prejudiced by ICW's failure to rescind.

119. The evidence did not establish by a preponderance that G&P reasonably relied on ICW's failure to issue a reservation of rights.

120. The evidence did not establish by a preponderance that G&P detrimentally relied on ICW's failure to issue a reservation of rights.

121. ICW was not estopped from raising an alleged concealment or misrepresentation regarding Inderjit Singh as a defense to coverage.

122. There is no showing of any manifest injustice or any intervening change in the law, evidence, or other circumstances bearing upon Judge Coyle's previous determination that the trailer was not a covered vehicle under the Clarendon policy.

123. In connection with the ICW policy, in June 1998 ICW processed and mailed a Motor Carrier Automobile Bodily Injury and Property Damage Liability Certificate of Insurance (Form MC 91X) and issued an MCS-90 endorsement.

124. It was ICW's understanding that the MCS-90 increased ICW's exposure, but ICW did not charge a higher premium for the issuance of the MCS-90.

125. Clarendon did not act as a volunteer in its participation in and settlement of the state court actions.[8]

CONCLUSIONS OF LAW

1. On or about January 6, 1998, G&P through Gill and Pannu

---

[8] The Court believes that Judge Coyle necessarily decided this issue, but the Court adds this finding in an abundance of caution.

applied for insurance coverage in the form of the ICW policy.

2. The policy provided that an intentional, fraudulent, and material misrepresentation or concealment would void the policy; reasonably construed, this requires for a defense to coverage not an innocent or negligent misrepresentation or concealment, but rather an intentional and fraudulent misrepresentation or concealment.

3. The policy thus provided for a different standard from that stated in Cal. Ins. Code § 331.

4. On or about January 6, 1998, Gill and/or Pannu on behalf of G&P did not misrepresent or conceal the status of Inderjit Singh as a driver on the application for insurance.

5. Gill and/or Pannu on behalf of G&P did not knowingly, intentionally, recklessly, with the intent to obtain coverage, with the intent to deceive or defraud, or with the intent to induce reliance by ICW, misrepresent, conceal, or fail to disclose facts concerning drivers or Inderjit in connection with the application for the ICW policy.

6. There was no knowledge or belief on the part of Gill, Pannu, G&P, or Mirko that there had been any misrepresentation, concealment, or failure of disclosure.

7. Considering the probable and reasonable influence of the facts upon ICW, the evidence did not establish by a preponderance that a failure to disclose Inderjit as a driver and/or his age and/or experience would have affected ICW's decision to enter into the contract; the disclosure or nondisclosure of Inderjit Singh as a driver was not material with respect to the decision to issue the ICW policy.

8. Considering the probable and reasonable influence of the facts upon ICW, the evidence did not establish by a preponderance that a failure to disclose Inderjit as a driver and/or his age and/or experience would have affected ICW's decision to enter into the contract at a particular premium rate; the disclosure or nondisclosure of Inderjit Singh as a driver was not material with respect to the decision to enter into the contract at a particular premium rate.

9. ICW did not meet its burden of establishing a defense to coverage on the ICW policy on the basis of material misrepresentation and/or concealment.

10. ICW did not waive its coverage defense.

11. ICW was not estopped from asserting its coverage defense.

12. Clarendon did not act as a volunteer in contributing towards settlement of the <u>Moore</u> action.

13. Judge Coyle's previous determination that the trailer was not a covered vehicle under the Clarendon policy was not clearly erroneous; no manifest injustice or intervening change in the law, evidence, or other circumstances bearing on the determination has been shown. Because in the order of June 30, 2000, Judge Coyle implicitly decided that the trailer was not a covered vehicle under the Clarendon policy, ICW is foreclosed under the doctrine of the law of the case from raising this issue. <u>United States v. Lummi Indian Tribe</u>, 235 F.3d 443, 452 (9th Cir. 2000).

///

////

<u>JUDGMENT AND DECLARATION OF THE PARTIES' RIGHTS AND OBLIGATIONS</u>

The content and form of the judgment to follow in this case were disputed in a motion to alter or amend judgment, which Judge Coyle denied because of mootness due to the anticipated trial. However, the Court notes that the parties reserved the right to stipulate to amounts expended in the defense of the <u>Moore</u> action. In the interest of the orderly administration of justice, by separate order the Court will direct the parties to meet and confer regarding the form and content of the judgment, to stipulate if possible to a draft of a judgment declaring the parties' rights and obligations, and to inform the Court of the status of these efforts and other aspects of this case.

IT IS SO ORDERED.

**Dated:   July 6, 2006**                    **/s/ Sandra M. Snyder**
icido3                                        UNITED STATES MAGISTRATE JUDGE

80